**John GATLING, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 8146.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 17, 1960.

Decided Jan. 6, 1961.

Herman Wolff, Jr., Raleigh, N. C. (T. Lacy Williams, and Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N. C., on the brief), for petitioner.

William A. Friedlander, Atty., Dept. of Justice, Washington, D. C., (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

John Gatling, petitioner taxpayer, seeks review of a decision of the Tax Court determining deficiencies in his income taxes for the years 1946 through 1949, penalties for fraudulently understating his income for the years 1947, 1948 and 1949 and for failure to file a tax return for 1946.[1]

In the absence of adequate books and records, the Commissioner of Internal Revenue used the "net worth" method of determining income during the taxable years, determined that taxpayer had no cash on hand at the beginning of the net worth period and that increases in his net worth during each of those years were attributable to currently taxable income. At the trial before the Tax Court taxpayer presented testimony as to possession, at the beginning of the period, of a large sum of cash, approximately $35,000 and claimed that certain additions to his net worth were attributable to expenditures from this cash fund during those years. The Tax Court held that the Commissioner was in error in refusing to allow any cash on hand at the beginning of the net worth period; that the taxpayer had cash on hand at the beginning of the period in the amount of $7,000 and the same amount at the end of each year in question. With some other modifications and adjustments, the determinations by the

---

1. The memorandum findings of fact and opinion of the Tax Court are unofficially recorded as T.C.Memo. 1959-224.

Commissioner of deficiencies and fraud were affirmed by the Tax Court.

The statutes here involved are found in the Internal Revenue Code of 1939 (26 U.S.C. 1952 Ed.).[2]

Taxpayer challenges the sufficiency of the evidence to support the Tax Court—

(1) in finding deficiencies in taxpayer's individual income taxes for the years 1947, 1948 and 1949;

(2) in finding that some part of the deficiency for each of those years was due to fraud with intent to evade tax; and

(3) in finding that the taxpayer did not file an income tax return for the year 1946.

■ It is well established that where issues of fact are raised, it is for the Tax Court, as the trier of such issues, to find the true facts from the record evidence, exercising its judgment as to the credibility of the witnesses.[3] The findings of fact are peculiarly the province of the trial court and not subject to reversal unless clearly erroneous.[4]

■ Throughout the investigation of taxpayer's financial affairs and in the litigation involving the deficiencies charged to him, he has consistently offered one explanation of his expenditures in excess of reported income—the claimed cash hoard of $35,000 at January 1, 1947, and $23,000 at December 31, 1950. Thus, he himself has chosen the ground upon which to challenge the Commissioner's computation.

The Tax Court's findings and discussion thereof cover more than twenty printed pages. We shall limit ourselves to a condensed statement of the testimony upon which the Tax Court found against the taxpayer.

From the outset of his career, taxpayer, who was unmarried, enjoyed a modest earnings record. When he was discharged from the army in 1919, he had approximately $1,000 in cash. From 1921 to 1942 he was employed by the North Carolina State Highway and Public Works Commission with an annual average salary of less than $2,000. During that period his total earnings amounted to approximately $41,000, the portion earned before 1939 being tax exempt. He claimed to have received, from part time engineering work, $700 on one occasion and $250 on another, and some small income from raising and selling bird dogs. Further, he claimed that before 1941 he sometimes earned from $2,000 to $3,000 annually on the stock market and that his credit balance in his brokerage account at one time reached about $12,000 and at another time about $16,000, his largest withdrawals having been in 1936 or 1937. However, all brokerage records before 1941 were destroyed and the 1941 closing of his account shows a payment to taxpayer of only $1,655.65. The Tax Court

2. Section 291. *Failure to File Return.*
"(a) In case of any failure to make and file return required by this chapter, within the time prescribed by law * *, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * * "
Section 293. *Additions to the Tax in Case of Deficiency.*
"(b) *Fraud.* If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, * * *."
Section 1112. *Burden of Proof in Fraud Cases.*
"In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner."

3. Commissioner of Int. Rev. v. Thomas, 1 Cir., 1958, 261 F.2d 643.

4. United States v. U. S. Gypsum Co., 1948, 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746; Bond v. Commissioner, 4 Cir., 1956, 232 F.2d 822, certiorari denied 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79.

found that his testimony as to stock market operations was vague, that it consisted principally of generalities and was unsupported by any books or records.

In 1939 he began to buy cheap rental houses, on one occasion paying $6,000 for nine houses, $1,500 in cash and the balance with borrowed money. By 1942 he had received $15,000 in rents but had expended up to $22,000 in construction, repairs and improvements. During the years 1942–1946, taxpayer was again in the military service serving in the Pentagon and his cousin, Bart Moore, managed the properties. The 1946 rental account balance was only $1,868. In 1947 Moore settled the account in full with taxpayer by paying him $1,600.

During his 1942–1946 military service, taxpayer received a total salary and allowances of $14,800 and at least $4,000 thereof was taxable. He claimed that he customarily deposited his $1,500 yearly allowance in a certain bank though by 1946 his balance there was less than $100. Prior to this military service, in the years 1923 to 1942, taxpayer lived with his parents paying them only $20 a month and he claims to have saved seventy-five cents out of every dollar he made. During his war service, he occupied a $54 a month apartment and asserts that he recovered much of the rent through reimbursement from guests who periodically occupied the apartment. It was during the war he first bought a car. Taxpayer claimed his expenses for living amounted to only $1,200 a year though the Tax Court increased this figure to $2,000 by adding to the reported amounts other expenses such as automobile and medical care.

Taxpayer's failure to file any tax returns during the years up to 1942, except when he paid a tax of less than $25 for the year 1940, tended strongly to indicate absence of income, other than salary, in any substantial amount.

In 1941 and 1942 taxpayer borrowed from banks, submitting financial statements in connection with each application. His first statement showed assets of $42,140 and cash in banks of $490, with no notation in the space provided for reporting cash on hand. The second statement shows assets of $40,025 and bank deposits of $450, noting cash on hand "small am't personal". In 1941 he borrowed $1,500 from his father, $700 of which remained unpaid in 1950 and on which he was paying interest. Taxpayer did not file State of North Carolina intangible property tax returns until 1953, notably *after* the start of the Internal Revenue investigation, when he filed back returns for four years showing cash as follows: 1947–$32,000; 1948–$24,000; 1949–$14,000; and 1950–$23,000. However, in a sworn statement to the agents during the investigation, taxpayer had claimed cash on hand as of the end of the year 1950 in the amount of $10,000 or less, subject to possible adjustment. In the same statement he described his net worth, as of December 31, 1942, as $65,000 in houses, *less loans*, with no mention of a hoard of cash.

Taxpayer testified that his accumulated cash was kept in his trunk at his father's home but during his army service he carried approximately $35,000 around with him in a suitcase. He admitted that he had not taken the trouble to count the money or keep any record of it. He attempted to explain by stating that he wished to have cash on hand in order to take advantage of any dips in the stock market but the evidence indicated that he had abandoned his dealings in the market about 1941 and prior to his re-entry into service in 1942. As the Tax Court pointed out, stock purchases could be made as readily through payments by check as by cash. Moreover, taxpayer, himself, recounted an experience when his brokers refused his tender of cash in a stock transaction, required him to walk to the bank, deposit the cash and pay them by check. One of his close personal friends, a hunting companion, testified that on one occasion in 1947 he went to the taxpayer's room where he found taxpayer counting bills from a pile of at least $30,000

spread out on his bunk. Taxpayer explained that, at intervals, he took his savings to a local bank, procured $100 bills which he then wrapped and placed in envelopes in the suitcase. At the trial he produced some empty brown envelopes on which he had made penciled notations which he interpreted as totaling $35,000.

However, in further testimony purporting to explain the manner in which he arrived at his estimate of a pre-1947 cash hoard of $35,000, he stated that he had about $23,000 at the end of 1950 and that he could calculate back from that figure to the beginning of 1947 and thus establish his cash holding on January 1, 1947, at $35,000. But his statements were characterized by vagueness and he apparently had no more reliable knowledge of his cash holdings at the end of 1950 than at the beginning of 1947. He stated that, at 1950, he was able to make a computation from his *records*. How, he does not reveal. The Tax Court found the story of the cash hoard of $35,000 to be incredible.

This, in substance, was taxpayer's attempt to show that the additional funds necessary to account for obvious excess of expenditures over reported income in the net worth years came from accumulated funds held before the start of that period and not from additional and unreported taxable income received during the period. From the best evidence available, the Tax Court carefully analyzed taxpayer's assets and investments back to the year 1939 and concluded that his investments had substantially exceeded his savings. Our attention is directed to supporting evidence, such as denials in the financial statements of cash on hand, the fact that taxpayer found the need in 1941 and 1942 to borrow at interest, inconsistent statements to the investigating agents, his financial and tax history, and the filing of North Carolina personal property tax returns after knowledge of the taxpayer that his tax affairs were under investigation.

In Anderson v. Commissioner, 5 Cir., 1957, 250 F.2d 242, 246–247, the court had this to say:

"We need not dwell long on the story of the hidden cache of money. Aside from being a story that would strain the credulity of any reasonable trier of the facts, the Tax Court had before it sufficient other evidence to warrant its rejection of taxpayer's uncorroborated story. (Citations omitted.) His income record, as disclosed by his tax returns, would not account for the saving of such an amount by January 1, 1942; the claimed cash was not included on financial statements furnished by taxpayer to the banks to establish credit as of January 1, 1942, or any subsequent statement; he was borrowing money at substantial rates of interest at the time he claims to have had this cache, such conduct being entirely inconsistent with the frugal nature demonstrated by taxpayer; there was no positive affirmative testimony as to the amount he claimed was in the jars at the opening date or how much he admitted was still there at the closing date. In light of all of these circumstances the Tax Court was not bound to accept the uncorroborated, implausible, incoherent contention of the taxpayer as to the existence of the hidden money."

See also Davis v. Commissioner, 7 Cir., 1956, 239 F.2d 187, 190; Epstein v. U. S., 6 Cir., 1957, 246 F.2d 563.

In Kite v. Commissioner, 5 Cir., 1955, 217 F.2d 585, 588, where the Tax Court had, as here, been confronted with a story featuring highly unusual procedures in the care and custody of an alleged cash hoard, the Fifth Circuit said:

" * * * When, however, as here, the tale is embellished with so many fantastic particulars, evidencing a rashness and recklessness in choosing the custodians and places of custody for this large amount of

illegal cash, the demands upon credulity pass all reasonable bounds, and the claim in effect that the Tax Court was compelled, or even ought to have accepted the story, must and will be rejected by us out of hand."

Upon the basis of the whole record the Tax Court, following what has come to be known as the Cohan rule,[5] exercised its best judgment and found as a fact that as of January 1, 1947, at the beginning of the net worth period, taxpayer had cash in the amount of $7,000 and that at the end of each of the years 1947 through 1950, taxpayer had at least $7,000 in cash. This was, under the facts available to the court, the best estimate that it was possible to make under the Cohan rule. This rule was considered by the Seventh Circuit in connection with an opening net worth figure in Bodoglau v. Commissioner, 7 Cir., 1956, 230 F.2d 336, 340, where it was said:

"We think the Tax Court was generous to taxpayer in fixing $100,-000 as the amount of cash on hand at the beginning of the net worth period, but under the Cohan rule such determination was proper. It is the function of the trier of the fact to weigh all the elements properly considered in the valuation and to translate them into dollars and cents. Commissioner of Internal Revenue v. Thompson, 3 Cir., 222 F.2d 893, 895; Colonial Fabrics, Inc. v. Commissioner of Internal Revenue, 2 Cir., 202 F.2d 105, 107. Nor is it essential that there be testimony of the specific figure fixed by the Tax Court. Burford-Toothaker Tractor Co. v. Commissioner of Internal Revenue, 5 Cir., 192 F.2d 633, 635."

It will be noted that, in the application of the Cohan rule, the fact finder is warranted in bearing heavily against the contentions of the taxpayer whose inexactitude is of his own making. The Tax Court, in view of the uncertainty and unreliability of taxpayer's testimony, would, in our opinion, have been justified in finding cash on hand in an amount less than $7,000 at the beginning and at the end of the net worth period. But the Tax Court's findings are affirmative, are based on the entire record, and we cannot say that they are clearly erroneous.

■ Taxpayer complains that he was improperly charged with deficiencies on the strength of an analysis showing increases in his net worth without a showing of a probable source of *unreported taxable receipts* during the years in question. He relies principally upon Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. However, he overlooks or refuses to accept the explanation of the Holland decision as found in United States v. Massei, 1958, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed. 2d 517. In the Massei case it was held that the Government need not demonstrate a taxable source for the unreported receipts reflected in the net worth computation where all possible sources of *nontaxable* income have been negatived. Where taxpayer has committed himself to one specific explanation of the source of funds expended, the Government should not be required to waste time and resources in futilely attempting to negate possible nontaxable sources which have, in effect, been denied by taxpayer's claim of a particular source. In Commissioner v. Thomas, 1 Cir., 1958, 261 F.2d 643, 646, in its decision upon a petition for rehearing, the Court referred to the alternative procedure authorized in the Massei case and said:

"* * * But this burden of negating is not so broad as it sounds, for although this case has been in litigation before the Tax Court and us for five and one-half years, the only source of nontaxable income which the taxpayers have contended accounts for taxpayers' increases in net worth, as we said,

---

5. Cohan v. Commissioner, 2 Cir., 1930, 39 F.2d 540.

was a substantial cash gift from Mrs. Thomas' father. It follows that in this case only that source needs to have been negated."

Throughout the investigation which led to the asserted deficiencies and the subsequent litigation, taxpayer has offered only the one explanation of expenditures in excess of reported income—the alleged cash hoard of $35,000 at the beginning of the net worth period. The Tax Court, as the trier of facts, has expressed its lack of faith in the testimony offered by taxpayer and by his close personal friend. It found, instead, that taxpayer had a cash fund of $7,000 at the beginning of the period but that he had the same amount at the end of each year in question. Therefore, these expenditures could not have been made from accumulated cash funds.

■ While admitting certain expenditures in excess of receipts, taxpayer argues that such expenditures, *standing alone,* are not sufficient to sustain a charge of civil fraud. With this stated principle we agree but it has been held that proof of consistent and substantial understatements of income over a period of years may constitute persuasive and convincing evidence of fraud.[6] Such understatements are even more convincing when supported by other circumstances pointing to an intention to evade taxation.

■ In its opinion the Tax Court recognized the requirement of the statute, Section 1112 of Internal Revenue Code of 1939, which places the burden of proof upon the Commissioner with respect to the fraud issue and also the well established principle that fraud is never presumed but must be established by clear and convincing evidence. The Tax Court had this to say:

"The petitioner has agreed to all items in the net worth computation except those specifically discussed and decided hereinabove. Upon all such controversial items we have made definite findings based upon the evidence presented. Of the controversial items, the item of cash on hand is by far the most important. Both parties put in proof in an attempt to show the cash on hand. Based upon the record, we are satisfied that as of January 1, 1947, the petitioner did not have more than $7,000 in cash, and that as of the end of each of the years 1947 through 1950 the petitioner had at least $7,000. * * * The reconstruction of the net worth computation, which is based entirely upon items either admitted by the parties or found by us upon the basis of the evidence presented, discloses that the correct net income for each of the years 1947, 1948, and 1949 is many times the amount of net income reported by the petitioner in his returns for those years. We are satisfied that such relatively large understatements of net income by the petitioner, whether due to under-reporting of income from disclosed sources or from undisclosed sources or from overstating deductions, could not have been due to inadvertence, carelessness, or ignorance. Based upon the whole record, we are satisfied that the respondent has met his burden of proof that some part of the deficiency for each of the years 1947, 1948, and 1949 was due to fraud

---

6. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; Lipsitz v. Commissioner, 4 Cir., 1955, 220 F.2d 871, certiorari denied 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753; Shahadi v. Commissioner, 3 Cir., 1959, 266 F.2d 495, certiorari denied 361 U.S. 874, 80 S.Ct. 137, 4 L.Ed.2d 113; Rogers v. Commissioner, 6 Cir., 1940, 111 F.2d 987; Drieborg v. Commissioner, 6 Cir., 1955, 225 F.2d 216; Kurnick v. Commissioner, 6 Cir., 1956, 232 F.2d 678; Schwarzkopf v. Commissioner, 3 Cir., 1957, 246 F.2d 731; Epstein v. United States, 6 Cir., 1957, 246 F.2d 563, certiorari denied 355 U.S. 868, 78 S.Ct. 116, 2 L.Ed.2d 74; Shaw v. Commissioner, 6 Cir., 1958, 252 F.2d 681; Bond v. Commissioner, 4 Cir., 1956, 232 F.2d 822, certiorari denied 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79.

with intent to evade tax, and we have so found as a fact. In so finding, we have not relied to any extent upon any presumption in favor of the respondent's determination of deficiencies in tax."

We cannot say that the Tax Court was in error.

■ The Tax Court found that the taxpayer had not filed a tax return for the year 1946. The Government introduced exhibits identified as "F" and "H", Forms 899. Column 2 of Form 899 is headed "List and Year," wherein is recorded the fact that the return of a particular taxpayer has been filed and any pertinent related information. This form contained a notation for the year 1946, "No Record," which is commonly interpreted by all who have familiarity with Internal Revenue Service records and practices to mean that there is no record in the reporting office concerning the particular taxpayer for the year in question. Other similar exhibits disclosed that a return had been filed by taxpayer in other years even where there was no tax due and no assessment made.

Taxpayer testified that in the latter part of 1946, he prepared returns for the years 1943, 1944, 1945 and 1946 with the assistance of an agent of the Internal Revenue Service in Washington with the understanding that the agent would keep the 1946 return in his basket and mail it to the Baltimore office after January 1, 1947. While able to produce retained copies of his returns for 1943–1945, taxpayer was unable to produce a similar copy for 1946 although, according to his story, the returns were all prepared at the same time and place. The story that an agent of the Internal Revenue Service did what the taxpayer testified, that is, that he prepared a return for taxpayer before the end of the year to which the return related and then agreed to hold it in his basket for later mailing to Baltimore, would strain the credulity of any court. The taxpayer was just as capable of holding and mailing the return as was the agent.

Taxpayer's inability to produce a retained copy for this one year, 1946, out of the four and the Internal Revenue Service's inability to locate a return for the same year support a strong inference that no return for 1946 was ever prepared or filed and we cannot say that the Tax Court's finding in that particular is erroneous.

The decision of the Tax Court is Affirmed.