Fred W. Isaacs v. Commissioner. Inez W. Isaacs v. Commissioner.
Isaacs v. Commissioner
Docket Nos. 525-64; 1922-64.
United States Tax Court
T.C. Memo 1968-249; 1968 Tax Ct. Memo LEXIS 49; 27 T.C.M. (CCH) 1315; T.C.M. (RIA) 68249; October 29, 1968. Filed Jerry Lee Jarvis, Durham, N.C., for petitioner in Docket No. 1922-64. J. Randall Groves, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax, and additions to tax on account of fraud pursuant to section 6653(b) of the Internal Revenue Code of 1954, as follows: Year
Deficiency
Addition to TaxSec. 6653(b)
1956
$ 5,295.11
$2,647.55
1957
10,630.82
5,315.41
1958
5,115.97
2,557.98
1959
7,059.09
3,529.54
1960
13,609.75
6,804.88
1961
9,765.24
4,882.62
*50 Since the petitioners, as husband and wife, filed joint Federal income tax returns for the years in question, the respondent mailed duplicate original notices of deficiency to each of the petitioners on November 15, 1963, and each petitioner filed a separate petition. In determining the deficiencies, the respondent employed the net worth method. In their respective petitions the petitioners each contested only a portion of each of the deficiencies, denied liability for additions to tax on account of fraud, and raised the issue of the statute of limitations with respect to the taxable years 1956 through 1958. The limitations issue will depend upon whether the returns filed for those years were false and fraudulent with intent to evade tax. Section 6501(c) of the Code. In his answer to the petition in each docket, the respondent set forth affirmative allegations of fact in support of his determination of both the deficiencies in tax and the additions to tax under section 6653(b) of the Code. Neither petitioner filed a reply as provided in Rule 15 of the Rules of Practice of this Court. Thereupon the respondent moved, pursuant to Rule 18(c) of such rules, that the affirmative allegations *51 contained in the answer in each docket be deemed admitted by each petitioner. By order dated February 3, 1965, the respondent's motion was granted, and it was ordered that such affirmative allegations in the respondent's answer should be deemed admitted. The respondent now concedes that the deficiencies in tax for the taxable years 1957, 1958, 1959, and 1961 are, respectively, $8,384.74, $5,025.72, $6,231.45, and $9,229.21, and that the amounts of additions to tax under section 6653(b) for such years are, respectively, $4,192.37, $2,512.86, $3,115.72, and $4,614.61. When the cases were called from the trial calendar, there was no appearance by or on behalf of the petitioner Fred Isaacs. The petitioner Inez Isaacs appeared through counsel who stated, in effect, that the 1316 deficiencies in tax were not contested and that no evidence would be presented on her behalf. He requested that any evidence offered by the respondent as to Fred Isaacs be taken into consideration in the case of Inez Isaacs, and conceded that if it should be decided that Fred Isaacs is liable for additions to tax on account of fraud then she is also liable for such additions because of having filed joint *52 returns. At the trial the respondent adduced testimony and other evidence, and upon the basis of such evidence and the affirmative allegations deemed to be admitted, we find the facts set forth hereinafter. Findings of Fact During the taxable years 1956 through 1961 the petitioners were husband and wife living together, and timely filed joint Federal income tax returns with the district director of internal revenue, Greensboro, North Carolina. At the time of filing their petitions they resided in Durham, North Carolina. During the years in question the petitioner Fred Isaacs practiced the profession of podiatry and had income from that source as well as from rents, dividends, and from sales of securities. The petitioner Inez Isaacs had income from investments, sales of assets, and from an estate. The petitioners kept separate accounts of their income and neither transferred funds to the other except certain amounts which Fred contributed toward the maintenance of their household. The respondent has not raised any question as to the proper reporting of the income of petitioner Inez Isaacs in the joint returns. We will hereinafter refer to the petitioner Fred Isaacs as the petitioner. *53 In August 1962 an internal revenue agent commenced an investigation of the petitioners' tax liability. In September a special agent was assigned to assist in the investigation of the petitioners' liability. The petitioner furnished the agents some records consisting of check stubs, bank statements, cancelled checks, and various posting books. Such records, however, were not complete. In the practice of his profession of podiatry the petitioner charged his patients fees of $4 or $5. Checks received during each day were recorded by his secretary in a daily posting book and were retained by her and deposited in the petitioner's bank account two or three times per month. At the end of each day the petitioner would himself take any cash received from patients and such cash was not recorded in the daily posting book. During the years 1959 to 1961, inclusive, the petitioner made only one deposit of currency (a deposit of $800 on July 1, 1960) in the North Carolina National Bank, the bank wherein he normally deposited the proceeds of his professional practice. The petitioner also sold custommade shoes to his patients. Such shoes cost the petitioner from $40 to $45 a pair and were sold *54 for $80 to $85 a pair. Income from shoe sales was recorded in a separate book of account called "the shoe book." During all the years in question the petitioner shared his office with another specialist in the same field, a Doctor Julian. The original arrangement with Julian was that petitioner would receive 50 percent of Julian's fees and that the petitioner would pay all the expenses of the office. However, in practice, all the fees due Julian were paid to the petitioner and then the petitioner turned over one-half of such receipts to Julian. The amounts paid by Julian's patients were recorded in records kept by Julian. None of petitioner's records contained entries of amounts which he received from Julian's patients. Each year the petitioner paid an accountant a fee to prepare the joint Federal income tax return. Just prior to the time for filing the return for each year, the petitioner gave the accountant a schedule containing a lump-sum total as representing his professional income, and such amount was used by the accountant in preparing petitioners' returns. Petitioner did not submit his books and records to the accountant. The petitioner's secretary prepared the professional *55 expense schedule for his tax return. In his returns for the taxable years in question the petitioner reported gross professional fees and net professional income as follows: Gross Professional Fees
Net Professional Income
1956
$13,446.15
$ 3,182.78
1957
17,661.67
4,777.35
1958
17,384.98
5,314.26
1959
17,426.00
4,378.96
1960
13,073.90
(1,039.60)
1961
18,602.00
(869.00)
The petitioner did not reveal to the accountant all the stock transactions which he consummated during the taxable years in question, and, therefore, the returns for such years do not accurately reflect his capital gains and losses. Nor did the petitioner furnish the revenue agents any records pertaining 1317 to his stock transactions. The agents asked the petitioner to furnish the names of all the brokerage houses with which he maintained trading accounts. The petitioner named some with which he maintained trading accounts. However, upon investigation, the agents found that the petitioner had failed to name 5 brokerage houses with which he had trading accounts. As the result of transactions made through these undisclosed brokerage accounts, the revenue agents increased *56 the capital gains reported in the returns for the taxable years 1957 through 1961. For the taxable year 1956 the petitioner did not report any capital transactions. However, he had reported for 1955 a net capital loss of $4,481.53. He therefore carried over to 1956 that amount plus $5,223.92 of unused capital losses claimed for the taxable years 1952 through 1954, or a total carryover to 1956 of $9,705.45, of which he claimed a deduction in 1956 of $1,000. However, the revenue agents discovered that for 1955 the petitioner had failed to report a securities transaction which resulted in a capital gain of $10,849.83, and had also underreported the gain on another securities transaction by $2,875. These two amounts totalling $13,724.83 were sufficient to offset all the capital losses claimed for 1952 through 1955, leaving no net capital loss which could be carried forward to 1956. Accordingly, the respondent disallowed the $1,000 loss claimed by the petitioner for 1956 and instead allowed a capital loss deduction of $906.60. In his return for 1957 the petitioner reported two securities transactions in each of which a capital loss was claimed, the total being $2,037.55. He continued *57 to carry forward net capital losses from prior years and claimed for 1957 a deduction of $1,000. Actually, the petitioner had capital gains in 1957, the taxable portion of which amounted to $3,168.83, and since there was no net capital loss carryover from prior years, the full amount of the taxable portion of the capital gains in 1957 should have been reported as income. The petitioner continued to claim a capital loss of $1,000 in each of the taxable years 1958, 1959, 1960, and 1961, whereas in such years he had capital gains, the taxable portion of which amounted to $1,885.76, $6,876.84, $15,780.64, and $5,821.30, respectively. The following tabulation shows the capital losses reported for each of the taxable years 1956 through 1961, the correct amount of taxable income or loss from capital transactions, and the net understatement of income from capital transactions: Year
Capital LossesReported
Correct Taxable Gainor (Loss)
Net Under-statement
1956
[1,000.00)$ H[ 906.60)
$ 93.40
1957
(1,000.00)
3,168.83
4,168.83
1958
(1,000.00)
1,885.76
2,885.76
1959
(1,000.00)
6,876.84
7,876.84
1960
(1,000.00)
15,780.64
16,780.64
1961 (1,000.00)
5,821.30
6,821.30
Total [6,000.00)
$32,626.77
$38,626.77
*58 The petitioner did not furnish the accountant information as to dividends received; rather he gave him an incomplete list of stock from which the accountant computed the amount of dividends included in the returns. Nor did the petitioner furnish the agents any records pertaining to his dividend income. The agents obtained the list of stocks which petitioner had submitted to the accountant and, by contacting the various brokerage houses, found the list to be incomplete. Throughout the taxable years in question the petitioner owned stocks and securities of an average cost of about $150,000. The agents computed the amount of taxable dividends which the petitioner had received upon the stock actually owned. The amounts of dividends actually received, and the amounts reported (some of which were reported as being nontaxable) by the petitioner from 1956 through 1961 were as follows: Year
AmountReceived
AmountReported
1956
$3,342.60
$1,238.50
19 57
4,666.15
2,235.00
1958
4,727.05
2,691.00
1959
4,182.93
2,406.25
1960
3,901.57
1,430.20
1961
3,191.70
1,378.00
By contacting tenants in the office building owned by the petitioner, the agents determined *59 that the petitioner had understated his rental income for the years 1959 and 1960 by the respective amounts of $200 and $1,305. Upon determining that the petitioner had not maintained adequate and complete books and records, the agents proceeded to compute the joint taxable income of the petitioners upon the net worth method. In preparing the net worth statement, the agents examined the public records of the Registrar of Deeds of Durham, North Carolina, the records of various brokerage houses, real estate brokers, automobile dealers and banks, and interviewed former employees and business associates of the petitioner. 1318 The petitioner told the agents that he kept very little cash on hand. He also told them he had never received any income from inheritances, devises, or gifts. In the net worth statement, the agents eliminated all nontaxable receipts. They allowed personal exemptions and itemized deductions. In computing the nondeductible personal expenditures, the agents made an analysis of disbursements by check, and with respect to personal living expenses paid by cash relied upon statements made by petitioners and upon certain records furnished by the petitioner Inez *60 Isaacs. The following tabulation shows for the taxable years in question the taxable income of the petitioners, the taxable income or loss shown in the income tax returns, and the understatement of taxable income in the returns: Year
Taxable IncomeReceived
Taxable In- comePer Returns
Under- statementof Taxable Income
1956
$20,448.95
$ (84.89)
$20,533.84
1957
29,664.54
3,879.03
25,785.51
1958
22,849.87
5,840.69
17,009.18
1959
25,187.27
4,943.84
20,243.43
1960
38,312.91
(2,135.65)
40,448.56
1961
29,564.55
(925.72)
30,490.27
In April 1963, the petitioners signed a consent extending the time for assessment of taxes for the taxable year 1959 to June 30, 1964. In September 1963, the respondent made jeopardy assessments against the petitioners for each of the years in question and collected the amount of $78,263.46. For each of the taxable years in question the petitioners underpaid the tax required to be shown on their returns. Some part of the underpayment of tax for each of the taxable years 1956 through 1961 was due to fraud within the contemplation of section 6653(b) of the Internal Revenue Code of 1954. *61 The petitioners' returns for the taxable years 1956 through 1958 were false and fraudulent with intent to evade tax within the contemplation of section 6501(c) of the Internal Revenue Code of 1954. Opinion The respondent's determination of the deficiencies herein is presumed to be correct and the burden of proof was upon the petitioners to show error therein. Welch v. Helvering, 290 U.S. 111; Burent v. Houston, 283 U.S. 223; Bond v. Commissioner, (C.A. 4) 232 F. 2d 822, certiorari denied 351 U.S. 878, affirming a Memorandum Opinion of this Court; and Carmack v. Commissioner, (C.A. 5) 183 F. 2d 1, certiorari denied 340 U.S. 875, affirming a Memorandum Opinion of this Court. The petitioners adduced no evidence whatever to show error in the respondent's determination. Furthermore, the petitioners failed to file replies to the respondent's answers which contain affirmative allegations of fact in support of his determination of deficiencies, and pursuant to Rule 18(c) of the Rules of Practice of this Court it was ordered that such affirmative allegations be deemed admitted. The facts *62 deemed admitted sustain such determination. We accordingly approve the deficiencies in tax determined by the respondent, as modified by concessions made at the trial by counsel for the respondent. In their petitions the petitioners allege that assessment and collection of any deficiencies for the taxable years 1956, 1957, and 1958 are barred by the 3-year statute of limitations provided in section 6501(a) of the Internal Revenue Code of 1954. The respondent, however, has determined additions to tax for fraud under section 6653(b) of the Code for each of the taxable years involved herein, and he contends that the returns for the taxable years 1956, 1957, and 1958 were false or fraudulent with intent to evade tax within the meaning of section 6501(c) of the Code, which provides that in such case the tax may be assessed and collected at any time. Upon the issue of fraud, the burden of proof is upon the respondent. Section 7454 of the Internal Revenue Code of 1954. Fraud is never presumed, but must be shown by clear and convincing evidence. Bond v. Commissioner, supra; Archer v. Commissioner, (C.A. 5) 227 F. 2d 270, *63 affirming a Memorandum Opinion of this Court; and W. A. Shaw, 27 T.C. 561. The respondent's allegations of fact which are deemed to be admitted, and other evidence adduced at the trial, affirmatively established the amount of the petitioners' taxable income and tax liability for each of the years in question. For each of the taxable years such taxable income was many times greater than the taxable income reported in the return. While the omission of taxable income, standing alone, is not sufficient to sustain a charge of fraud, it is 1319 well established that proof of consistent and substantial understatements of income over a period of years may constitute persuasive and convincing evidence of fraud. Holland v. United States, 348 U.S. 121; Gatling v. Commissioner, (C.A. 4) 286 F. 2d 139, affirming a Memorandum Opinion of this Court; Lipsitz v. Commissioner, (C.A. 4) 220 F. 2d 871, certiorari denied 350 U.S. 845, affirming 21 T.C. 917; Shahadi v. Commissioner, (C.A. 3) 266 F. 2d 495, certiorari denied 361 U.S. 874, affirming 29 T.C. 1157; Anderson v. Commissioner, (C.A. 5) 250 F. 2d 242, *64 certiorari denied 356 U.S. 950, affirming a Memorandum Opinion of this Court; and Schwarzkopf v. Commissioner, (C.A. 3) 246 F. 2d 731, affirming a Memorandum Opinion of this Court. The record, moreover, shows that the petitioner omitted specific items of income. In furnishing information to the accountant who prepared his returns, the petitioner failed to disclose all the securities which he owned, with the result that the returns failed to reflect in each year large amounts of dividends received. The returns for the taxable years 1957 through 1961 also failed to show large amounts of capital gains from transactions in securities. The petitioner failed to reveal to the accountant all his stock transactions. These specific omissions of income were too large, too consistent, and over too long a period to be attributable to mere inadvertence or error. Bond v. Commissioner, supra.Furthermore, there are other indications of a fraudulent intent on the part of the petitioner. When the agents asked the petitioner to furnish the names of all the brokerage houses with which he maintained trading accounts, he named some but failed to name 5 brokerage houses *65 with which he had trading accounts. And the petitioner did not enter in his daily posting book cash payments received from his patients and did not maintain records of his share of the fees paid by Julian's patients. These facts, we think evidence an intent on the part of the petitioner to conceal a part of his income. It is our conclusion, and we have found as a fact, that some part of the underpayment in tax for each of the taxable years was due to fraud, and we therefore approve the respondent's determination of additions to tax, as modified by his concessions at the trial, on account of fraud pursuant to section 6653(b) of the Code. [1] In reaching this conclusion, we have not relied to any extent upon any presumption in favor of the correctness of the respondent's determination of deficiencies in tax. We have also concluded, and found as a fact, that the returns for the taxable years 1956, 1957, *66 and 1958 were false or fraudulent with intent to evade tax within the contemplation of section 6501(c) of the Code. It follows that assessment and collection of the deficiencies and additions to tax for those years are not barred by the statute of limitations. Decisions will be entered in accordance with the foregoing. Footnotes
1. Section 6653(b) of the Code provides in part as follows: Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *↩