Jay J. and Rose B. Armes v. Commissioner.
Armes v. Commissioner
Docket Nos. 2034-66, 5901-66.
United States Tax Court
T.C. Memo 1969-181; 1969 Tax Ct. Memo LEXIS 116; 28 T.C.M. (CCH) 903; T.C.M. (RIA) 69181; September 3, 1969, Filed Towner Leeper, 7th Floor Southwest Nat'l Bank Bldg., El Paso, Tex., for the petitioners. Ralph V. Bradbury, Jr., for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax as follows: *10
Additions to Tax
Year
Income Tax
Sec.6653(b)
Sec.6653(a)
1960
$1,943.99
None
$ 97.20
1961
4,507.14
$2,253.57
1962
8,127.48
None
406.37 At the trial *117 respondent conceded the additions to tax under section 6653(b) [1] and then, with leave of court, filed an amended answer alleging that petitioners are liable for an addition to tax under section 6653 (a) for 1961 in the amount of $225.36. Certain issues have been settled by the parties. The issues remaining are: (1) Whether for 1960 and 1961 petitioners omitted from gross income amounts properly includable therein which were in excess of 25 percent of the amount of gross income stated in their returns, so as to lift the bar of the statute of limitations pursuant to section 6501(e)(1). (2) Whether petitioners' gross receipts for 1960, 1961, and 1962, determined by respondent through use of the bank deposits and cash expenditures method, were understated, and if so, in what amounts. (3) Whether any part of any underpayments of tax by petitioners for 1960, 1961, and 1962 were due to negligence or intentional disregard of rules within the meaning of section 6653(a). Findings of Fact Jay J. Armes and Rose B. Armes, husband and wife during 1960, 1961 and 1962, were legal residents of El Paso, *118 Texas, at the time their petitioners were filed. They filed their joint income tax returns for these three years with the district director of internal revenue at Austin, Texas. Jay J. Armes will usually be referred to herein as Jay and Rose B. Armes as Rose. Jay was born August 12, 1932. On May 10, 1945, his hands were severely injured as the result of an explosion of a box of torpedoes used in railroad signaling. He was rushed to a physician, and both of his hands were amputated two inches above the wrists. He now wears prostheses or artificial hands, often described as hooks, which he has learned to use with great efficiency. He has made numerous personal appearances before injured soldiers and patients in hospitals, as well as in several motion pictures, to demonstrate his ability to use his artificial hands. On December 6, 1948, Jay, by and through his father [2] as next friend, instituted a suit against the Texas and New Orleans Railroad and The Texas and Pacific Railway Company, defendants, to recover damages of $103,500 resulting from the loss of his hands. The complaint alleged that one of the defendants had negligently allowed the torpedoes to be left on or near its right-of-way *119 and that Jay had picked up the torpedoes, rubbed them together, and caused them to explode in his hands. The suit was dismissed without prejudice on June 2, 1949, and neither Jay nor his father recovered anything on the damage claim. Jay and Rose were married in 1950; their marriage produced two daughters, Marleen and Debra. In 1955 or 1956 Jay 904 opened a private detective agency known as the Central Bureau of Investigation. However, the agency lost money and was closed within two years. In 1956 Jay was employed for a short time by Goodwill Industries. Thereafter he was unemployed for about two years, until he became a partner in a small night club known as The Office Lounge, which was operated for a few months and then closed. ojuse M. Ontiveros, Rose's father, was hospitalized for an injury in late 1958. On December 31, 1958, Ontiveros gave Jay a general power of attorney to manage his affairs. Pursuant to the power of attorney, Jay, on April 16, 1959, conveyed to the State of Texas, in consideration of $3,300, a residence located at 5102 Stevenson Street in El Paso, where Ontiveros and his minor daughter Mary had lived. *120 When Ontiveros was discharged from the hospital, he went to live with Jay and his family for a few months. During the period that Ontiveros resided with Jay he was receiving monthly retirement pay of $30 per month from the City of El Paso, $93 (or $84) per month from the Railroad Retirement Board, social security payments of $30 per month for the support of his daughter Mary, and social security benefits for himself in amounts not shown by the record. On September 17, 1959, Ontiveros revoked the power of attorney which he had given Jay, and at or about the same time he moved from Jay's home. Thereafter, on November 5, 1959, he instituted a suit against Jay, alleging the latter's misappropriation of the $3,300 received from the State of Texas, as well as Railroad Retirement Board and City of El Paso pension checks in the total amount of $900. The suit was dismissed. About two weeks after Ontiveros moved from petitioners' residence, Jay's father, Pedro D. Armas (sometimes referred to herein as Pedro), and his wife moved into petitioners' home to live with them. Pedro was then about 58 years of age. He was a meat cutter by trade, and his wages had been relatively low: e. g., $30 *121 to $35 per week in 1948. He was the father of eight children (including three who died at or near birth) and had lived in very modest housing. His daughter Eva and her husband, following their marriage, had lived with him during two different periods and had contributed to household expenses. Pedro suffered from alcoholism and had been without work from time to time, on occasions for periods of five or six months. He obtained free hospital care by repeatedly representing himself to be indigent. He died December 26, 1961. Jay sold an unimproved lot to the State of Texas on February 27, 1958, for $1,000. He sold a parcel of real property on July 22, 1959, to Charles and Janet B. Matthews for $1,200 or $1,500 plus the Matthews' equity in a residence. Jay sold the Matthews' equity in the residence for $1,000 on August 6, 1959. Jay filed no Federal income tax returns for 1957, 1958, or 1959. An investigation was made of his income for these years by a revenue agent, and no deficiencies were proposed. In February 1960 Jay obtained a license to operate a private detective agency under the name "The Investigators." Jay was engaged in operating this agency (as well as other business endeavors) *122 during the remainder of 1960 and all of 1961 and 1962. In this business he conducted domestic, criminal, and industrial investigations. During the years in controversy, Jay maintained checking and savings accounts at the First State Bank "Five Points" and a checking account at The State National Bank of El Paso. However, on occasions he cashed checks received for his services which he did not deposit in these accounts. He made no deposits of any kind in his bank accounts between August 9, 1960, and March 30, 1961, and then made eight separate deposits totaling $3,502.50 between March 31, 1961, and April 24, 1961. In June 1961 the Desert Hills Motor Hotel gave Jay two checks totaling $3,266.30 ($1,200 and $2,066.30) in payment for services rendered and equipment installed by The Investigators; the checks were deposited during that month in the checking account of The Investigators. These checks were neither recorded as gross income in the weekly cash summary sheets or ledgers maintained by Jay nor included in petitioners' gross income for 1961. Jay had a hobby of collecting silver dollars and occasionally deposited them in his bank accounts. On May 29, 1962, he deposited 1,203 *123 silver dollars in his account at the First State Bank. 905 On June 7, 1966, Rose and Jay were divorced, at which time they executed a property settlement agreement. Rose obtained custody of the two children and became entitled to receive $150 per month from Jay for child support. She also received a residence at 7923 Santa Maria and some furniture. Jay received the property at 8118 North Loop, furnishings for the master bedroom, library, Polynesian room, living room, dining room, kitchen, bedroom, and den, swimming pool plants, a 1963 Cadillac, a 1963 Corvette, an African lion, a chimpanzee, and six German shepherd dogs. In addition, Jay received The Investigators detective agency. Under the settlement, the value of the property received by Jay was greater than that received by Rose. The joint income tax returns of petitioners for the years 1960, 1961, and 1962 reflect the following amounts of gross receipts and net profits or losses for The Investigators: 1960
1961
1962
Gross
Receipts
$ 531.75
$ 4,651.95
$23,383.37
Net Profit (or loss)
(1,605.28)
(12,014.17)
5,333.05 The returns do not reflect the receipt of income from any source other *124 than the operations of The Investigators. Jay used the services of professional accountants in the preparation of his returns for each of these years. The income tax returns of petitioners for 1960, 1961, and 1962 were assigned to a revenue agent for examination. For 1960 Jay made available to the revenue agent no journals, ledgers, or canceled checks; bank statements, check stub books, and invoices and receipts for expenditures were shown to the revenue agent, but they were incomplete. For 1961 and 1962, Jay made available to the revenue agent weekly cash summary sheets, maintained by a secretary, reflecting receipts and expenditures and a ledger to which postings were made once a month by a bookkeeper. The invoices, receipts, bank statements, canceled checks, and check stub books in support of the receipts and expenditures were incomplete. The revenue agent concluded that the records furnished to him were too incomplete or inaccurate to permit a correct determination of petitioners' taxable income. Thereupon he calculated petitioners' gross receipts by use of the bank deposits and cash expenditures method. In making his calculations the revenue agent ascertained the total amount *125 of petitioners' bank deposits and then sought to eliminate redeposits, transfers between accounts, loans, and any other nontaxable income. In addition, he analyzed all checks written on the accounts to determine the purposes for which they were used, such as business expenses, personal living expenses, or capital expenditures. The amount of the checks identified as business expenses was then compared with the amount of business expenses determined from other records in order to credit petitioners with the full amount of their deductible expenses. To such expenditures were also added an estimate of living expenses and capital expenditures paid in cash. The following table sets forth respondent's determinations made in the notices of deficiency, adjustments thereto, and the amounts by which petitioners understated their gross receipts:
1960
1961
1962
Net deposits of business receipts (per deficiency notices)
$ 6,093.00
$27,155.80
$43,204.71
Cash expenditures, including business, living, and capital expenditures (per deficiency notices) 9,715.87
12,300.81
6,877.51
Total gross receipts (per deficiency notices)
$15,808.87
$39,456.61
$50,082.22
Adjustments (per stipulation) *
(1,527.59)
(1,225.00)
Total gross receipts
$15,808.87
$37,929.02
$48,857.22
Gross receipts reported on income tax returns 531.75
4,651.95
23,383.37
Understatement of gross receipts
$15,277.12
$33,277.07
$25,473.85
*126 Since respondent, in determining total cash expenditures for each year, gave no effect to checks written to cash and unidentified payees, the foregoing understatement of gross receipts is to be adjusted for checks written to cash in the amounts of 906 $2,002.35 in 1960, $2,029.39 in 1961, and $1,568.57 in 1962. *
Ultimate Findings of Fact Petitioners omitted from gross income amounts properly includable therein which were in excess of 25 percent of the gross income stated in their returns for 1960 and 1961. The underpayments of tax by petitioners for 1960, 1961, and 1962 were due to negligence or intentional disregard of rules Opinion The issues are purely factual: (1) Whether petitioners understated their taxable income for 1960, 1961, and 1962, and if so, in what amounts, and (2) whether any underpayments of tax were due to negligence or intentional disregard of rules and regulations within *127 the meaning of section 6653(a). [3] Respondent had the burden of proving that petitioners omitted from their tax returns an amount equal to at least 25 percent of the gross income they reported for 1960 and 1961, in order to lift the bar of the statute of limitations on assessments under section 6501(e)(1). [4] Respondent also was required to prove that the underpayment for 1961 was due to negligence within the meaning of section 6653(a); otherwise, the burden of proof rested with petitioners. *128 We have concluded that petitioners, in their returns, understated their gross receipts for each year in the amounts reflected by our findings; that petitioners omitted more than 25 percent of their gross income from their returns for 1960 and 1961; and that the underpayments of tax for all three years were due to negligence or intentional disregard of the rules. To explain the large bank deposits in excess of their reported gross income, petitioners offered the testimony of an array of witnesses, mainly family members, who told a bizarre story in strikingly similar phraseology of nontaxable receipts consisting of (1) huge government pensions and social security payments; (2) gifts from Jay's father derived from the settlement of a personal injury claim, a pirate's chest filled with silver dollars, and boxes stuffed with two-dollar bills; and (3) an investment in Jay's business by a third party. According to petitioners, Jay's father-in-law, Jose M. Ontiveros, was drawing government pensions and social security benefits totaling $800 to $900 per month during the time he lived with them from December 1958 to September 1959. These funds, along with $3,300 obtained from the sale *129 of a residence to the State of Texas, were allegedly appropriated by Jay for his own purposes under the authority of the general power of attorney given him by Ontiveros on December 31, 1958. But the testimony of disinterested witnesses shows that while Ontiveros received government checks while living with Jay, they did not total anything near $800 to $900 per month. According to an official of the City of El Paso, Ontiveros was receiving a pension of $30 per month from the city; other evidence shows that he collected a pension of $93 (or $84) per month from the Railroad Retirement Board. In addition to these pensions, he received social security payments of $30 per month for his dependent daughter Mary and an additional social security monthly benefit for himself. Although the amount of the latter was not precisely shown, the maximum monthly social security payment in 1960 was $127. Sec. 215(b), Social Security Act, 42 U.S.C.A. 415(a), applicable to 1960. Thus, the largest amount that Ontiveros' retirement payments could have totaled was $280 ($30 + $93 +$30 +$127) per month. And Jay apparently did not receive even this amount, for the complaint in the suit *130 filed by Ontiveros against him on 907 November 5, 1959, alleged that he wrongfully collected eight Railroad Retirement Board checks of $84 each and eight City of El Paso checks of $30 each, together with a payment of $3,300 from the State of Texas, but said nothing about any social security checks. The second alleged source of nontaxable receipts was Jay's father, Pedro Armas. According to petitioners, when Pedro moved into Jay's home in the early fall of 1959, he was burdened with 14 shoe boxes wrapped in plastic and old newspapers (which, it later developed, contained $15,000 to $20,000 in silver dollars) and 10 shoe boxes tied with twine (which, it was later learned, contained $10,000 to $13,000 in two-dollar bills These funds, so it is claimed, were apparently derived from a large recovery on a personal injury claim arising from Jay's loss of his hands in 1945, from Pedro's wages as a meat cutter, and from "conservative" management of the family's finances. When one of the shoe boxes containing silver dollars later broke open, Jay had a "pirate's chest" built, large enough to hold some, but not all, of the silver dollars. These funds, it was testified, were given to Jay and *131 gradually deposited in his bank accounts. This story likewise was refuted by the bulk of the credible testimony. The attorney who represented the railroads in the suit to recover damages for Jay's loss of his hands testified that the railroads paid nothing on Jay's claim and that, in view of the Texas law on the subject, no insurance company would have made a substantial settlement of a claim asserted on behalf of Jay, a minor, without the entry of a judgment. An attorney with the law firm which represented Jay and his father in that matter testified that the firm's files showed no recovery on the claim. Another witness stated that Pedro received outpatient care at a local hospital as an indigent on 72 different occasions between December 6, 1956, and October 20, 1961, and that the hospital made six separate investigations between December 29, 1959, and November 28, 1961, to verify his indigency. Still another witness, the wife of a former employer, testified that Pedro's salary was $30 to $35 per week in 1948; there was further testimony that Pedro frequently was out of work, on occasions for five or six months, due to heavy drinking. Finally, although Jay claimed that his father *132 gave him this huge cash hoard, other members of the family testified that they inherited no money or property and received no gifts from their father. In the light of this testimony, to find that Pedro had $25,000 to $30,000 on hand in January 1960 would require an exercise in fantasy. Other witnesses called by respondent provide an explanation of the deposits of silver dollars in Jay's bank accounts, particularly the $1,203 deposited on May 29, 1962. A former secretary of Jay testified that during the period from March to May 1962, The Investigators provided a guard to stand watch over a pirate's chest filled with silver dollars, in connection with an advertising display at the Bassett Center. She stated that the chest was similar to the one (if not the same one) which Jay claims he had built to protect his father's cash hoard. Also, a young lady who was dated by Jay during the summer of 1961 testified that he had a hobby of collecting silver dollars, that he kept a collection in a coin rack in the desk drawer at his office, and that when the rack was filled he carried the dollars home with him in a cloth bag. His deposits of coins in his bank account were evidently made from these *133 sources. Finally, as to the investment in his business, Jay and his present wife, the former Linda Chew, testified that she invested $6,000 in The Investigators on November 28, 1962, for which she was to receive 25 percent of the profits. Jay testified that he deposited $1,000 of this sum in his bank account on November 30, 1962, and, for some unexplained reason, kept the balance of $5,000 in a dresser drawer in his home until December 18, 1962, when he deposited it in his personal (not business) account. But he admitted that he had never filed a partnership return with Linda and that, although they were not married until June 30, 1966, she had never received any distribution of profits from the business. In the light of all this evidence - to say nothing of a host of inconsistencies on details developed through searching cross-examination - we are compelled to conclude that petitioners' story of gifts and cash hoards was a fabrication. We are not deterred from so concluding by the fact that Jay received more than half of the community property when he and Rose were divorced in 1966 - particularly in view of his physical handicap, the discretion exercised by divorce courts in making *134 property settlements, and, perhaps of primary importance, his failure to convince us that the discrepancy in values was as great as he claims. Petitioners, however, contend that respondent's argument fails as a matter of law. 908 They maintain that the mere making of a bank deposit does not prove the receipt of income, citing Jesse Ullman Reaves, 31 T.C. 690 (1958), affd. 295 F. 2d 336 (C.A. 5, 1961), and that there must be a reasonable relationship between the deposits and the taxpayer's income-producing activity to support the inference that the deposits represent income, citing Goe v. Commissioner, 198 F. 2d 851 (C.A. 3, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 897 (1952), and Hague Estate v. Commissioner, 132 F. 2d 775 (C.A. 2, 1943), affirming a Memorandum Opinion of this Court, certiorari denied 318 U.S. 787 (1943). Petitioners earnestly insist that such a relationship is totally absent here in that the record does not show that a "one man detective agency" could produce as much income as has here been determined. Petitioners' contentions cannot be sustained. *135 The detective agency was not shown to be incapable of producing the disputed income. Moreover, there is evidence that during the years in issue Jay bought and sold guns, and was engaged in a partnership with Joe Chew, Sr. The partnership was in the business of installing burglar alarms and, in addition to other jobs, installed a burglar alarm system in William Beaumont Hospital. There is also some evidence suggesting that Jay was involved in prostitution activities: he frequented bus stations, the train station, and the airport looking "for girls that had no place to go - that were - had nothing to do." He rented a room in a hotel on a continuous basis, where he admittedly arranged meetings between men and women, although he testified that he kept the room for surveillance purposes in connection with matrimonial cases being investigated by the detective agency and that "[The] only people * * * [he] ever brought back together of the opposite sex was in reconcilation." While the amount of income derived from these various activities is not shown, such activities are possible sources of income, and there has been no direct refutation, except Jay's denials, of the possiblity that petitioners *136 realized income from these sources. Indeed, Jay lived well and represented from time to time that he had income of $15,000 to $20,000 per year. Even assuming that the detective agency was the sole source of income, petitioners misstate the rule. Goe v. Commissioner, supra, relied upon by them, rejects the proposition that "in order to establish an inference of income the evidence must link the bank deposit with an identified income producing activity" in these words: Of course proof of such a relationship is one way of proving that the deposit represents income. * * * But many other circumstances may create the same inference. "Deposits in checking accounts are so often made up of income that where * * * that is the fair inference to be drawn from the facts it proper to give it effect." See Hague Estate v. C.I.R., 2 Cir., 1943, 132 F. 2d 775, 777. This court and others have drawn that inference upon widely varying facts in numerous tax cases. * * * In Gatling v. Commissioner, 286 F. 2d 139, 144 (C.A. 4, 1961), affirming a Memorandum Opinion of this Court [Dec. 23,872(M)], the court supplemented the above rule as follows: In United States *137 v. masse, 355 U.S. 595 (1958) it was held that the Government need not demonstrate a taxable source for the unreported receipts reflected in the net worth computation where all possible sources of nontaxable income have been negatived. Where taxpayer has committed himself to one specific explanation of the source of funds expended, the Government should not be required to waste time and resources in futilely attempting to negate possible nontaxable sources which have, in effect, been denied by taxpayer's claim of a particular source. * * * Respondent here effectively refuted petitioners' claims of nontaxable gifts from Pedro Armas and Jose M. Ontiveros and of an investment by Linda Chew. Petitioners committed themselves to an explanation that the unreported sums were derived from these sources, together with certain real estate sales. Obviously, the real estate sales made prior to the years in controversy do not explain the large bank deposits made by petitioner during those years. Respondent carried his burden of proving omissions of at least 25 percent of petitioners' gross income from their returns for 1960 and 1961. Taxable income was received by petitioners during *138 each of the three years in the amounts reflected by our findings. We also sustain the additions to tax under section 6653(a). For 1960, the lack of journals or ledgers, the incompleteness 909 of the bank statements, canceled checks, bank stubs, and invoices and receipts for expenditures, the cashing of third party checks instead of depositing them, and the substantial understatement of gross income as reflected by respondent's bank deposits method establish that at least part of the underpayment was "due to negligence or intentional disregard of rules." For 1961 and 1962, the incompleteness of petitioners' books of original entry, cash summary sheets, invoices in support of expenditures, bank statements, and canceled checks, together with the substantial understatements of income, all show again that at least part of the underpayments were due to negligence or intentional disregard. Decisions will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Jay's father spells his last name "Armas."↩
*. Respondent also concedes that petitioners are entitled to a "Nonbusiness deduction" of $720.50 and a cost-of-goods-sold deduction of $3,714.72 for 1962.↩
*. By Official Tax Court Order, dated 11-26-69 and signed by Judge Featherston, this paragraph was added. - CCH.↩
3. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. ↩
4. Sec. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (e) Substantial Omission of Items. - Except as otherwise provided in subsection (c) - (1) Income Taxes. - In the case of any tax imposed by subtitle A - (A) General Rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph - (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; * * *↩