JOHNIE HAMILTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hamilton v. Commissioner
Docket No. 17085-81.
United States Tax Court
T.C. Memo 1987-278; 1987 Tax Ct. Memo LEXIS 278; 53 T.C.M. (CCH) 996; T.C.M. (RIA) 87278; June 8, 1987. Fred K. Persons, for the petitioner. Roberta M. Hamm, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: *279 Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Year
Deficiency
Sec. 6653(b) [1]
1972
$32,682
$16,341
1973
202,958
101,479
1974
205,410
102,705
The issues for decision are: 1. Whether petitioner understated his taxable income in the amounts of $72,023, $297,834, and $314,330, for the taxable years 1972, 1973, and 1974, respectively, as determined by respondent's net worth plus expenditures income reconstruction method; 2. Whether any part of the underpayment of tax each year was due to fraud; and 3. Whether the statute of limitations bars the assessment and collection of the deficiencies in and additions to income tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner Johnie Hamilton resided in Northville, *280 Michigan at the time the petition was filed in this case. Petitioner filed his United States Individual Income Tax Returns (Forms 1040) for the calendar years 1972, 1973, and 1974 with the Internal Revenue Service Center in Cincinnati, Ohio. Petitioner is a former Detroit police officer who retired from the force in 1968 for disability due to a leg injury. During the years before the Court, petitioner owned and operated bars and restaurants in the Detroit area called Country USA and Henry VIII. He also owned certain rental properties in that area. In 1973 he purchased another bar and restaurant in California called Henry VIII California and J & H Stables. In 1974 he also acquired another bar and restaurant in Detroit called Dos Gringos. Except for Dos Gringos, the businesses were reported on petitioner's various Schedule C's as sole proprietorships. Dos Gringos went into operation about Christmas Day in 1974, but was omitted from petitioner's 1974 tax return. Petitioner also had some interest in a bar called Dirty Harry's which was not included in any of his tax returns. On his individual income tax returns for the calendar years 1972, 1973, and 1974, petitioner reported *281 the following items of income, loss, and deduction: Amount of Net Income, (Loss), (Deduction)
Item
1972
1973
1974
Sole Proprietorships: Country USA Bar & Restaurant
($5,570)
$40,433 $78,303 Henry VIII Bar & Restaurant
(28,967)
51,830 83,856 Henry VIII of California Bar
(12,030)
(79,594)
& Rest.
J & H Stables
(14,336)
(32,909)
Rental Properties: 7057-79 Michigan
1,836 71 1,056 39759 Michigan Ave.
1,300 1715 Middlebelt
(21,295)
Gambling Winnings - Las Vegas
41,000 Interest Income
908 1,009 Other Income
[2] 9,959 8,299 66,876 41,685 Nontaxable Portion of Disability
Pension
(5,200)
Itemized Deductions
(2,933)
(7,027)
(7,672)
Personal Exemptions
(2,250)
(2,250)
(3,000)
Taxable Income as Reported
$3,116 $57,599 $25,813 *282 Michael Scott (Scott) was petitioner's tax accountant during the years in issue. Scott prepared petitioner's income tax returns for the calendar years 1972, 1973, and 1974. In addition to preparing petitioner's income tax returns, Scott also provided petitioner some ongoing accounting services throughout the years in issue, primarily preparing employment tax returns and monthly sales tax returns. Scott also visited petitioner's bars monthly to pick up the bars' daily cash sheets. These daily cash sheets, prepared by petitioner or his employees, contained a figure for each day's total receipts. Scott did not audit these daily cash sheets; he merely recapped the total amount shown on each daily sheet to get a total receipts figure for that particular month. Scott would then enter this monthly total into a journal he kept for petitioner's bars. At year end Scott would recap the monthly totals in the journals to arrive at a total for the year, and would use these yearly totals in preparing petitioner's income tax returns. Similarly, any other information or figures Scott utilized in preparing petitioner's income tax returns for the years in issue were provided to him by petitioner. *283 In the fall of 1975, Dennis Modzelewski, an internal revenue agent, conducted a field audit of petitioner's income tax returns for the calendar years 1972, 1973, and 1974. In the course of his examination of petitioner's books and records, Modzelewski found that there was a lot of missing data. He found that petitioner's bank statements were incomplete, checks were missing, and that a considerable portion of the books and records were either not available or were not made available to him. Modzelewski on several occasions provided petitioner's representative with document requests seeking these books and records, but he was never provided with a complete set of books and records. During the course of his audit, Modzelewski determined that there was an understatement of income on petitioner's income tax returns for all three years involved. At that time he discussed the understatements with petitioner, and petitioner told him that part of the understatements could be attributable to gambling winnings in 1973 that were not reported. Petitioner also told him that he could have had credit card sales at his bars which might not have been included on the daily sales sheets that *284 were given to his accountant, Scott. Internal Revenue Agent Earl Umstead was later assigned to petitioner's case. Due to the inadequacy of petitioner's books and records, Umstead reconstructed petitioner's income for the three years in issue using the net worth plus expenditures method. Umstead determined petitioner's net worth as of December 31 for each of the years 1971, 1972, 1973, and 1974. The determination showed that petitioner's net worth increased during each of the years 1972, 1973, and 1974 by $46,039.79, $182,200.60, and $135,716.94, respectively. The increase for each year was then adjusted for nondeductible personal expenditures and nontaxable income during that specific year. Most of the items on respondent's net worth computation are undisputed. Respondent's computation of petitioner's net worth, as it appears in the statutory notice of deficiency, is summarized as follows: Johnie Hamilton
Summary of Net Worth
12/31/71
12/31/72
12/31/73
12/31/74
Cash on Hand and in Banks
$ 6,376.93
$18,525.23
$ 37,549.99
$ 41,374.98
Business Assets and Real
Estate
87,500.00
235,950.00
467,929.46
754,671.46
Total Assets
93,876.93
254,475.23
505,479.45
796,046.44
Less: Depreciation
1,083.00
9,783.00
29,052.50
55,665.38
Assets Net of Depreciation
92,793.93
244,692.23
476,426.95
740,381.06
Less: Liabilities
63,484.99
169,343.50
218,877.62
347,114.79
Net Worth
$29,308.94
$75,348.73
$257,549.33
$393,266.27
Less: Prior Year Net Worth
$29,308.94
$ 75,348.73
$257,549.33
Increase in Net worth
46,039.79
182,200.60
135,716.94
Add: Personal Expenditures
15,820.00
27,721.93
21,455.00
Add: Net Gambling Losses
as Expenditures
24,000.00
160,000.00
198,000.00
Total Income
85,859.79
369,922.53
355,171.94
Less: Nontaxable Pension
5,200.00
5,200.00
5,200.00
Less: Itemized Deductions
3,270.81
7,039.70
6,819.00
Less: Personal Exemptions
2,250.00
2,250.00
3,000.00
Corrected Taxable Income
75,138.98
355,432.83
340,142.94
Less: Taxable Income as
Reported
3,116.00
57,599.00
25,813.00
Unreported Taxable Income
$72,023.00
$297,834.00
$314,330.00
*285 Respondent prepared detailed schedules in support of these various items, most of which need not be discussed. The parties agree that petitioner's opening net worth as of December 31, 1971, was $29,308.94, as set out above. The parties agree that the amounts listed above as petitioner's "cash on hand and in banks" are also correct. Petitioner agrees that the amounts of $235,950.00, $467,929.46, and $754,671.46, determined for the "business assets and real estate," are correct to the extent that they state the value of the assets, but petitioner disputes that he owned all of these assets. The itemized business assets and real estate, as they appear in respondent's net worth computation, are as follows: Johnie Hamilton - Business Assets & Real Estate
12/31/72
12/31/73
12/31/74
Country USA Equip
$ 90,000.00
$ 90,000.00
$ 90,000.00
Licenses, etc.
10,000.00
10,000.00
10,000.00
Henry VIII Equip
62,500.00
62,500.00
62,500.00
Basement Improvement
9,000.00
9,000.00
9,000.00
Paving
550.00
550.00
Sign
1,150.00
1,150.00
7057-79 Michigan
10,000.00
10,000.00
10,000.00
Land
15,000.00
15,000.00
15,000.00
Henry VIII Calif. sales tax
1,130.00
1,130.00
Henry VIII Calif. Furn & Fix
22,600.00
22,600.00
Leasehold interest
19,200.00
19,200.00
Leasehold improvement
12,200.00
12,200.00
Goodwill
3,500.00
3,500.00
License
14,000.00
14,000.00
Covenant not to compete
3,500.00
3,500.00
Escrow-rent deposits
1,350.00
1,350.00
Cost of purchase
422.50
422.50
1641 Middlebelt Road *
10,000.00
207,218.96
Architect
3,000.00
3,000.00
Land Lots 870-876
15,000.00
15,000.00
15,000.00
Equipment verified
1,512.04
Equipment verified
33,885.03
33,885.03
Equipment unverified per return
60,602.93
60,602.93
Land Lots 855-865
23,000.00
23,000.00
23,000.00
29037 Clarita
14,000.00
14,000.00
36059 Angeline Circle
28,900.00
28,900.00
J & H Stables
60,000.00
39859 Michigan Ave.
28,500.00
Country USA Inventory
700.00
700.00
700.00
Henry VIII Inventory
750.00
750.00
750.00
Henry VIII Calif. Inventory
1,989.00
1,500.00
Total
$235,950.00
$467,929.46
$754,671.46
*286 Although petitioner stipulates to the value of these business assets and real estate, he does not stipulate that he owned 100 percent of them. Petitioner alleges that the following properties, set forth in respondent's itemized list of petitioner's business assets and real estate, were owned jointly with another individual, Ron Sweatt: 12/3/72
12/31/73
12/31/74
1641 Middlebelt Road
$ 10,000.00
$207,218.96
Architect
3,000.00
3,000.00
Land Lots 870-876
$15,000.00
15,000.00
15,000.00
Equipment verified
1,512.04
Equipment verified
33,885.03
33,885.03
Equipment unverified per
return
60,602.93
60,602.93
Land Lots 855-865
23,000.00
23,000.00
23,000.00
J & H Stables
60,000.00
Total
$38,000.00
* $145,487.96
* $404,218.96
*287 Ron Sweatt did not testify at the trial. Petitioner testified that he and Ron Sweatt were 50 percent partners in the properties located at 1641 Middlebelt Road in Inkster, Michigan and in the restaurant built on that property in 1974. The restaurant, called Dos Gringos, opened for business around Christmas Day in 1974. No partnership return was filed for 1974 and no copy of any partnership agreement was proffered to the Court. At trial petitioner proffered several documents in an attempt to show his alleged partnership with Ron Sweatt in the 1641 Middlebelt Road property. These documents included an undated and unsigned file copy of the mortgage on the property, in favor of the Wayne Bank in Michigan. Also proffered were copies of insurance bills, the title insurance policy on the property, and a legal description of the property. All the documents proffered by petitioner listed the owners of the 1641 Middlebelt Road property as "John Hamilton and Ron Sweatt," or "John Hamilton and Ronald Sweatt, General Partners." Petitioner testified that he bought out Sweatt's interest in the property and restaurant during the first or second week in January 1975, approximately two weeks *288 after the restaurant opened. The parties to the case have stipulated that the value of the real property, equipment, and other assets of the Dos Gringos restaurant at 1641 Middlebelt Road, as of December 31, 1974, was $344,218.96 ($404,218.96 - $60,000 for J & H Stables). Thus, a 50 percent interest in the 1641 Middlebelt Road property had a value of $172,109.48 on December 31, 1974. Petitioner alleges that he bought Sweatt out for $10,000 and the assumption of Sweatt's portion of the $160,000 outstanding mortgage on the property. The purported bill of sale refers to a sale of 500 shares of stock in Joro, Inc., a Michigan corporation, not otherwise explained in the record. There is no competent, probative evidence that Ron Sweatt had any interest in the Dos Gringos restaurant property. Petitioner also claims that he only had a 50 percent interest in "J & H Stables," a horse racing activity. On his income tax returns for the years 1973 and 1974, petitioner reported the results of J & H Stables operations on his Schedule C as a sole proprietorship. At trial, petitioner admitted that the $32,909 loss he reported from J & H Stables on his return for 1974 was the entire loss for *289 the 1974 year for J & H Stables. In the course of his examination of petitioner's income tax returns for the years in issue, Internal Revenue Agent Umstead reviewed every line item on those returns. There was no indication on any of the returns examined that petitioner might have been involved in partnership with another individual, or that another individual had any interest in any of the assets or properties stated in the returns. There is no competent, probative evidence that Ron Sweatt had any interest in J & H Stables. During the years 1972, 1973, and 1974, petitioner frequently went on junkets to Las Vegas to gamble. Whenever he was in Las Vegas, the casinos at the Riviera Hotel and Caesar's Palace Hotel extended credit to him. When he arrived at the casinos on these junkets, petitioner had an approved line of credit to be extended to him, and would sign a draft ("marker") for that amount in favor of the casino. Petitioner would then be given the amount of credit extended to him in the form of chips. When petitioner repaid the casinos for their advances to him, most of these repayments were made in cash. During the years in issue, a gambler who had won chips in one casino *290 could cash those chips in at another casino. Some of petitioner's cash repayments were made while he was still in Las Vegas. However, most of petitioner's cash repayments were made by him after he had returned to Michigan. Harry Maciarz was employed by the Riviera Hotel during 1972 and half of 1973, and at Caesar's Palace for the rest of 1973 and 1974. Maciarz's job was to collect outstanding gambling debts owed to the hotels from persons living in the State of Michigan. Maciarz visited petitioner's business establishments in Michigan several times during the years in issue to collect petitioner's outstanding gambling debts. Maciarz would take payment in the form of cash or check only. During 1972 petitioner borrowed and repaid the following amounts from the Riviera Hotel in Las Vegas: Method of
Repayment
Date Borrowed
Amount Borrowed
Date Repaid
Chips
Cash
2/22/72
$ 4,000  2/22/72
$2,000
2/23/72
5,000
2/23/72
$ 7,000
3/08/72
7,000
3/09/72
2,000
3/10/72
1,000
3/22/72
10,000
4/08/72
3,500
4/08/72
6,500
4/23/72
10,000
5/28/72
1,000
5/28/72
1,500
5/28/72
1,500
5/28/72
1,000
5/29/72
5,000
5/29/72
1,000
5/29/72
5,000
5/30/72
10,000 5/30/72
1,000
6/09/72
10,000
7/03/72
8,500
7/04/72
1,500
7/04/72
2,000
7/28/72
11,000
8/04/72
1,000
8/21/72
10,000 10/03/72 1,000
10/19/72 1,000
11/28/72 8,000
12/07/72 6,000
12/07/72 3,000
12/08/72 1,000
12/08/72 1,000
12/09/72 1,000
12/09/72 1,000
12/26/72 8,000
12/26/72 1,000
12/26/72 1,000
12/27/72 1,000
Total    $88,500  $9,500
$65,000
*291 Of the $65,000 cash repayments made, $13,000 was made while petitioner was still in Las Vegas, and $52,000 was made after petitioner returned to Michigan. At the end of 1972, petitioner still owed the Riviera Hotel $14,000 on his gambling debts. During 1973 petitioner borrowed and repaid the following amounts from the Riviera Hotel in Las Vegas: Method of
Repayment
Date Borrowed
Amount Borrowed
Date Repaid
Chips
Cash
1/07/73
$ 1,000
2/03/73
10,000
2/07/73
$ 5,000  2/07/73
5,000
2/09/73
2,000
3/09/73
2,000
4/04/73
2,000
4/20/73
4,000
4/23/73
4,000
4/25/73
1,000
4/25/73
$ 1,000
4/25/73
10,000 4/25/73
2,000
4/26/73
3,000
4/26/73
2,000
6/06/73
13,000
7/14/73
3,000
7/14/73
7,000
7/15/73
2,000
7/16/73
12,000
7/17/73
2,000
7/17/73
8,000
7/20/73
12,000
8/16/73
2,000
8/16/73
2,000
8/16/73
2,000
8/16/73
2,000
8/25/73
10,000 8/25/73
2,000
8/26/73
12,000
8/27/73
11,000 8/27/73
11,000
8/28/73
13,000 8/28/73
2,000
8/28/73
6,000
8/31/73
5,000
9/19/73
4,000
9/20/73
4,000
11/22/73 5,000
Total    $99,000  $27,000
$80,000
*292 Of the $80,000 cash repayments made, $44,000 was made while petitioner was in Las Vegas, and $36,000 was made after petitioner returned to Michigan. At the end of 1973 petitioner owed the Riviera Hotel $6,000 on his gambling debts. During 1973 petitioner also borrowed and repaid the following amounts from the Caesar's Palace Hotel in Las Vegas: Method of
Repayment
Date Borrowed
Amount Borrowed
Date Repaid
Chips
Cash
5/29/73
$ 6,000  5/29/73
4,000
6/07/73
$ 5,000
7/16/73
2,000
8/13/73
10,000 9/06/73
7,000
9/19/73
8,000
9/19/73
8,000
9/20/73
$3,000
5,000
10/24/73 2,000
11/21/73
5,000
11/21/73
7,000
11/21/73
6,000
11/22/73
10,000 11/22/73 5,000
13,000
11/23/73
5,000
12/06/73 15,000
12/19/73
3,000
12/19/73
17,000 12/20/73
5,000
12/31/73 25,000
Total   $88,000  $8,000
$80,000
Of the $80,000 cash repayments made, $26,000 was made while petitioner was in Las Vegas, and $54,000 was made after petitioner returned to Michigan. During 1974 petitioner borrowed and repaid the following amounts *293 from the Riviera Hotel in Las Vegas: Method of
Repayment
Date Borrowed
Amount Borrowed
Date Repaid
Chips
Cash
1/04/74
$ 5,000
1/09/74
$ 5,000  1/09/74
$ 5,000
1/09/74
10,000 1/10/74
10,000
1/29/74
2,000
2/18/74
8,000
3/05/74
10,000
3/11/74
2,000
3/14/74
8,000
5/02/74
6,000
5/07/74
4,000
5/13/74
4,000
5/13/74
4,000
6/25/74
5,000
6/30/74
5,000
7/02/74
10,000 8/30/74
10,000
9/15/74
1,000
9/16/74
9,000
10/15/74 10,000
Total  $64,000  $14,000
$55,000
Of the $55,000 cash repayments made, $10,000 was made while petitioner was in Las Vegas, and $45,000 was made after petitioner returned to Michigan. At the end of 1974, petitioner owed the Riviera Hotel $1,000 on his gambling debts. During 1974 petitioner also borrowed and repaid the following amounts from the Caesar's Palace Hotel in Las Vegas: Method of
Repayment
Date Borrowed
Amount Borrowed
Date Repaid
Chips
Cash
1/07/74
$ 4,000  1/09/74
12,000 1/09/74
$ 16,000
1/29/74
12,000 1/29/74
$ 6,000
1/29/74
4,000
1/29/74
2,000
1/30/74
6,000
2/18/74
14,000 2/19/74
16,000 2/20/74
5,000
2/20/74
11,000
2/28/74
15,823
3/11/74
4,000
3/11/74
4,000
3/11/74
11,177
3/14/74
5,000
3/15/74
25,000 4/09/74
15,000
5/03/74
5,000
5/28/74
10,000
6/30/74
3,000
6/30/74
17,000
6/30/74
21,000 7/01/74
2,000
7/01/74
6,000
7/01/74
1,000
7/02/74
4,000
7/03/74
6,000
8/23/74
6,000
9/15/74
8,000
10/13/74 8,000
10/16/74 6,000
11/17/74 6,000
11/18/74 16,000 11/18/74 10,000
12/23/74 6,000
Total    $166,000  $20,000
$143,000
*294 Of the $143,000 cash repayments made, $71,177 was made while petitioner was in Las Vegas, and $71,823 was made after petitioner returned to Michigan. At the end of 1974, petitioner owed Caesar's Palace $3,000 on his gambling debts. In reconstructing petitioner's income for the taxable years in issue, respondent used the net worth plus expenditures method. In so doing, respondent added the amounts of $24,000, $160,000, and $198,000 to petitioner's net worth for the years 1972, 1973, and 1974, respectively. These amounts reflect the cash repayments made by petitioner to the two Las Vegas hotels which had extended him credit. Respondent's theory is that the payment in cash of gambling debts is a personal expenditure of funds for purposes of the net worth computation. Respondent assumed that petitioner's repayments which were made in chips, as opposed to cash, were either chips that petitioner still had from when he originally signed the markers or chips that petitioner had won. Thus, the repayments made in chips were not considered a personal expenditure of funds for the purpose of respondent's net worth computation. As to the cash repayments, respondent assumed these amounts *295 did not come from gambling winnings but from other sources of unreported income, presumably the operation of petitioner's bars and restaurants or other businesses. Petitioner, on the other hand, contended that the $41,000 winnings reported in 1972 was net of all gambling losses, and that his winnings in 1973 and 1974 at least equaled his losses, so that all repayments presumably came from gambling winnings, not from unreported income from other sources. During 1972 petitioner made cash repayments on his gambling debts in the amount of $65,000. On his income tax return for the year 1972, petitioner reported gambling winnings from Las Vegas in the amount of $41,000. Respondent netted these two figures in determining that $24,000 should be added to petitioner's net worth for that year as a net personal expenditure for gambling losses. At trial, petitioner testified that the $41,000 gambling winnings reported on his 1972 return were the excess of his winnings over his losses during 1972. However, petitioner kept no books or records on any of his gambling activities in Las Vegas during any of the years involved in this case, and had no information as to the extent of his winnings *296 or losses for any year. During 1973 petitioner made cash repayments on his gambling debts in the amount of $160,000, and in 1974 his cash repayments totaled $198,000. Petitioner testified that during 1973 and 1974 he had gambling winnings in approximately the same amount as his gambling losses. However, he also testified that he purchased the Henry VIII bar and restaurant in California with some of his gambling winnings in 1973. Since he kept no books or records of his gambling activities during those years, petitioner offered the testimony of two friends, James Frasure and Louis Fithian, in an attempt to show his alleged gambling winnings. Frasure, a lifetime friend of petitioner, went to Las Vegas with petitioner once in the summer of 1973. Frasure was not with petitioner during the times petitioner was gambling at the casino. However, Frasure testified that one evening petitioner returned to their room from the casino and told Frasure that he (petitioner) was $65,000 up at the time. He and petitioner then rented a car and drove to California where petitioner purchased a bar, Henry VIII California. Fithian, also a retired police officer, went to Las Vegas with petitioner *297 once in 1974. Fithian testified that when he was with petitioner in the casino, petitioner was "winning a lot," but that petitioner left and went home to Michigan before he did, so he didn't know how much money petitioner went home with. On one occasion, Fithian picked up petitioner at the airport in Michigan after one of petitioner's trips to Las Vegas. Fithian testified that petitioner told him he had won a lot of money in Las Vegas, and that petitioner had $33,000 on him when he picked him up at the airport. During the years in issue petitioner's accountant advised him that he was required to report all of his gambling winnings, and that he could then deduct his gambling losses to the extent of his winnings. However, on his income tax returns for the years 1973 and 1974, petitioner did not report any amount as gambling winnings from Las Vegas. Thus, respondent determined that the cash repayments of $160,000 and $198,000 during the years 1973 and 1974, respectively, should be added to petitioner's net worth in those respective years as a personal expenditure of funds for gambling losses. The itemized list of petitioner's other personal expenditures, as it appears in respondent's *298 net worth computation, is as follows: Johnie Hamilton
Personal Expenditures
12/31/72
12/31/73
12/31/74
Child Support Payments
$ 6,150.00
$ 7,800.00
$ 7,800.00
Down payment 1973 Mark IV
2,500.00
Cash payment 1974 Mark IV
7,402.44
Balance of Trade-in Mark IV
360.00
Federal Tax Paid
864.00
Mobile Home Down payment
2,598.49
Food
1,500.00
1,500.00
1,500.00
Clothing
1,000.00
1,000.00
1,000.00
Misc., Gasoline, Insurance,
Gifts, Health
2,000.00
2,000.00
2,000.00
Taxes - Real Estate
1,100.00
1,348.00
1,564.00
- state and local income tax
110.00
2,468.00
Interest
1,400.00
3,153.00
2,109.00
Contributions
170.00
450.00
Medical
2,150.00
Total Personal Expenditures
$15,820.00
$27,721.93
$21,455.00
Petitioner stipulated to all the amounts listed in the above personal expenditures schedule except for the amounts listed for Food, Clothing, and "Misc., Gasoline, Insurance, Gifts, Health." Revenue Agent Umstead, who prepared the net worth computation, testified that the amounts determined for Food, Clothing, and "Misc., etc.," were estimates he made based *299 on his limited knowledge of petitioner's life-style. Umstead used the lowest figures he felt were reasonable under the circumstances. Umstead requested from petitioner's then attorneys information relative to petitioner's personal living expenses, but was not provided with any such information. Based on his net worth computation, respondent determined that petitioner had unreported taxable income in the amounts of $72,023, $297,834, and $314,330, for the years 1972, 1973, and 1974, respectively. In his statutory notice of deficiency, respondent determined deficiencies in petitioner's Federal income taxes in the amounts of $32,682, $202,958, and $205,410, for the years 1972, 1973, and 1974, respectively, and additions to the tax under section 6653(b) in the respective amounts of $16,341, $101,479, and $102,705. OPINION Petitioner, a former police officer retired for disability, owned and operated bars and restaurants in Detroit, Michigan. He also owned other properties and businesses. Although not a professional gambler, [3] petitioner gambled frequently. As he testified, "I gamble almost daily. I gamble at the races; I gamble in Vegas; I gamble." Petitioner maintained no *300 books or records of his gambling winnings or losses; he reported what he described as $41,000 net income from gambling in Las Vegas in 1972 and no gambling income from that source in 1973 or 1974. Petitioner's books and records for his businesses and other income-producing properties were incomplete and inadequate. Using the net worth plus expenditures method, respondent determined that petitioner failed to report substantial amounts of taxable income in each of the years before the Court. Respondent also determined that petitioner's omissions of taxable income and the resulting underpayments of tax were due to fraud and, accordingly, determined that petitioner was liable for the fraud addition under section 6653(b). Petitioner bears the burden of showing that respondent's determinations of the deficiencies are incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent, however, has the burden of establishing by clear and convincing evidence the elements of the fraud for the *301 section 6653(b) addition. Sec. 7454; Rule 142(b); Zack v. Commissioner,692 F.2d 28 (6th Cir. 1982), affg. a Memorandum Opinion of this Court, cert. denied 460 U.S. 1084 (1983); Stone v. Commissioner,56 T.C. 213, 220 (1971). Furthermore, here the statute of limitations precludes respondent's assessment and collection of the deficiencies in and additions to tax unless respondent proves that petitioner's returns were false or fraudulent with the intent to evade tax so that the tax may be assessed "at any time" under section 6501(c). [4] In this regard, the elements of the fraud under section 6501(c)(1) for limitations purposes are essentially the same as the elements of the fraud under section 6653(b)[5] for the 50 percent civil fraud addition for any "underpayment" of tax "due to fraud." Tomlinson v. Lefkowitz,334 F.2d 262 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976); *302 McGee v. Commissioner,61 T.C. 249, 256-257, 261 (1973), affd. 519 F.2d 1121 (5th Cir. 1975); Amos v. Commissioner,43 T.C. 50, 55 (1964), affd. 360 F.2d 358 (4th Cir. 1965). [6]
*303 Moreover, in a case such as this when the fraud allegations are inextricably intertwined with the alleged omissions of income -- both depending upon the accuracy of respondent's net worth determinations -- we must be extremely careful so that we do not bootstrap a finding of fraud upon a taxpayer's failure to carry his burden of proof with respect to the underlying deficiencies. See Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955), affg. in part a Memorandum Opinion of this Court; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,53 T.C. 96, 106 (1969). See also George v. Commissioner,338 F.2d 221, 223 (1st Cir. 1964); Reis v. Commissioner,1 T.C. 9, 13 (1942), affd. 142 F.2d 900 (6th Cir. 1944). [7] Accordingly, we need not, and indeed should not, address the correctness of the underlying deficiencies unless and until we find that respondent has carried his burden of establishing fraud, that is, has established by clear and convincing evidence that (1) there was an underpayment of tax, and (2) some part of such underpayment of tax each year *304 was due to fraud. Under the terms of section 6653(b), as it read during the years involved in this case, the fraud addition attaches to the entire deficiency even though only a portion of the underpayment is due to fraud. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), cert. denied 379 U.S. 827 (1964), cert. denied 389 U.S. 912 (1967), affg. 37 T.C. 703 (1962); Johnson v. United States,94 Ct. Cl. 345, 39 F. Supp. 103 (1941). See also *305 Breman v. Commissioner,66 T.C. 61 (1976), and Stewart v. Commissioner,66 T.C. 54 (1976). The language of section 6653(b) -- "any part of any underpayment" -- presupposes the existence of an underpayment. Absent an underpayment, there is nothing to which the fraud addition may attach. Sec. 6653(b). See Jenkins v. United States,313 F.2d 624, 627 (5th Cir. 1963). Consequently, the existence of an underpayment is an element of the fraud that respondent must establish. See Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Although respondent need not prove the precise amount of the underpayment of tax, nonetheless, he still must prove that petitioner has, to some extent, underpaid his taxes. To prove that petitioner understated the taxable income and underpaid the taxes required to be shown on his returns, respondent relies upon his redetermination of petitioner's income under the net worth plus expenditures method. Although the net worth plus expenditures method is an acceptable mechanism for testing the accuracy of a taxpayer's tax returns, its use requires the exercise of "great care and restraint." *306 Holland v. United States,348 U.S. 121, 129 (1954). [8] An essential condition to our acceptance of respondent's use of this method is his establishment "with reasonable certainty" of an opening net worth to serve as a starting point. Holland v. United States,supra at 132. That condition has been met in the present case since petitioner has stipulated to the amount respondent determined as his opening net worth, $29,308.94. The net worth plus expenditures method is not an accounting system, but rather, when properly applied, is evidence of income. Holland v. United States,supra at 130, 133; Lipsitz v. Commissioner,21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955). Petitioner challenged and vigorously litigated just three items in respondent's net worth computation, principally the net gambling losses. However, even if the Court were to rule for him on every item in dispute, it appears to the Court that there would still be substantial increases in petitioner's net worth and substantial amounts of unreported *307 taxable income in each year. Based on the Court's own pro forma net worth computation, giving petitioner the benefit of the doubt on every disputed item, there would still be unexplained increases in petitioner's net worth of $41,059.83, $127,567.56, and $78,864.67 for the years 1972, 1973, and 1974, respectively. There would still be unreported taxable income of $38,543.02, $78,700.79, and $52,837.67 for the years 1972, 1973, and 1974, respectively, which amounts are quite substantial compared to the $3,116, $57,599, and $25,813 taxable incomes petitioner reported for those respective years. See Appendix A to this opinion. Since the Court has not had the benefit of the parties' views on this macro approach to the evidence of record, the Court will discuss the items litigated by the parties. [9]
*308 The parties have stipulated to all but three of the items in respondent's net worth computation. The three items in dispute are as follows: (1) certain business assets and real estate, (2) net gambling losses as expenditures, and (3) certain personal expenditures. First, as to the personal expenditures, we exclude respondent's determinations for the items "Food," "Clothing," and "Misc., Gasoline, Insurance, Gifts, Health," for the purpose of determining whether he has proved an underpayment. Respondent's revenue agent admitted that these figures were merely estimates. Respondent offered no evidence of petitioner's actual expenditures for these items, and his mere estimates do not establish these expenditures by clear and convincing evidence. Next, as to the net gambling losses as personal expenditures, we will, for this initial determination, adjust the figures respondent has determined. Respondent has proved that petitioner made these cash expenditures to the casinos during the years in issue, and has also proved a likely source of the cash petitioner used to make these expenditures, namely petitioner's bars and restaurants or other businesses. Petitioner claims that he had *309 gambling winnings in these years in approximately the same amounts as his cash payments to the casinos, and claims these winnings were the source of his cash payments to the casinos. However, petitioner's argument is severely weakened by the fact that he kept no books or records of his gambling winnings or losses during the years in issue, and that he did not report any gambling winnings on his 1973 and 1974 returns, even though he conceded that his accountant had advised him that he should report all of his winnings and that he could deduct his losses up to the extent of his winnings. Petitioner's only evidence of his alleged gambling winnings during 1973 and 1974 is his own self-serving testimony and the testimony of two of his friends, James Frasure and Louis Fithian. We find the testimony of petitioner, Frasure, and Fithian vague and unpersuasive with respect to any gambling winnings petitioner might have had in 1973 and 1974. Further, this Court is not bound to accept testimony of longtime friends, even if it is not expressly contradicted. See *310 Gatling v. Commissioner,286 F.2d 139, 142-143 (4th Cir. 1961), affg. a Memorandum Opinion of this Court. [10] Moreover, petitioner testified that he used part of his gambling winnings to buy another bar, the Henry VIII in California, in 1973, so that part of any winnings would not have been available to repay his debts to the casinos.
In making his net worth computation, respondent determined that the total cash repayments petitioner made to the casinos, partly made while petitioner was still in Las Vegas and partly made after he returned home to Michigan, should be included as personal expenditures for gambling losses in the net worth computation. For the purpose of determining whether respondent has proved an underpayment by clear and convincing evidence, we conclude, however, that the cash repayments petitioner made while still in Las Vegas should not be included. During the years in issue an individual could borrow chips from one casino, cash them in at another casino, and then use this cash to repay the original amount borrowed. Respondent has proved a likely source of the cash *311 repayments made in Detroit, namely petitioner's bars located in Michigan. Based on these facts, we find that respondent has not proved by clear and convincing evidence that the cash repayments petitioner made while he was still in Las Vegas should be included as personal expenditures in the net worth computation. Thus, we conclude that, for the purpose of determining whether respondent has proved an underpayment by clear and convincing evidence, only the cash repayments petitioner made after he returned home to Detroit should be added to his net worth as a personal expenditure of funds for gambling losses. The last item in the net worth computation still in dispute concerns business assets and real estate. Petitioner stipulated to the value of these assets as shown in the net worth computation, but contends that several of them were owned jointly in partnership with another individual, Ronald Sweatt. Specifically, petitioner points to the 1641 Middlebelt Road property (which includes land lots 855-865, 870-876, the restaurant Dos Gringos, and certain equipment) and the J & H Stables horse racing activity as those properties in which he had only a 50 percent interest. With respect *312 to J & H Stables, petitioner offered no evidence other than his unpersuasive, vague, generalized, self-serving testimony. We find that respondent has proved by clear and convincing evidence that the J & H Stables activity was owned entirely by petitioner. There is no competent, probative evidence of any ownership interest on the part of Ron Sweatt. Moreover, petitioner reported J & H Stables on his Schedule C as his sole proprietorship, and claimed 100 percent of the loss from that racing activity. Thus, we accept J & H Stables on his net worth computation as wholly owned by petitioner. With respect to the 1641 Middlebelt Road property, petitioner has not proved to our satisfaction that he and Sweatt were equal partners in these assets. However, the documents petitioner has proffered do suggest that there may have been some co-ownership in these assets. Thus, for the purpose of determining whether respondent has proved an underpayment by clear and convincing evidence, we will exclude 50 percent of the 1641 Middlebelt Road property. Even excluding 50 percent of the 1641 Middlebelt Road property, the cash repayments to the casinos made while petitioner was still in Las Vegas, *313 and the personal expenditures for which respondent used estimates, respondent's net worth computation still shows substantial unaccounted for and wholly unexplained increases in petitioner's net worth and expenditures during the years in issue. This can be roughly shown as follows: [11]
1972
1973
1974
Unreported Taxable Income
(Unaccounted for increases in net
worth and expenditures, as
determined by respondent)
$72,023 $297,834 $314,330 Less items discussed above: Personal Expenditures - Food,
Clothing, Misc., etc.
(4,500)
(4,500)
(4,500)
50% of 1641 Middlebelt Road property
(19,000)
(72,744)
(172,109)
Cash repayments to the casinos
made in Las Vegas
(13,000)
(70,000)
(81,177)
Add back: 50% of liabilities and
depreciation attributable to the
1641 Middlebelt Road property
14,020 13,131 85,644 Net Increase
$49,543 $163,721 $142,188 *314 As previously stated, the net worth plus expenditures method is evidence of income. Holland v. United States,supra. Thus, the net increases shown above constitute unreported taxable income of petitioner since petitioner only disputes the net worth computation as to the three previously discussed items. Therefore, we find that respondent has carried his burden of establishing by clear and convincing evidence that there was an underpayment of tax during each of the three years in issue. Next, we must determine whether these underpayments of tax were due to fraud. The fraud envisioned by section 6501(c)(1) and section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand *315 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Stoltzfus v. United States,supra;Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a factual question to be determined on the basis of the entire record. Mensik v. Commissioner,supra,328 F.2d at 150; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,supra,53 T.C. at 105-106. Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered and fraudulent intent can be established by circumstantial evidence. *316 Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Stone v. Commissioner,supra,56 T.C. at 223-224; Otsuki v. Commissioner,supra,53 T.C. at 105-106. Although mere understatement of income standing alone is not sufficient to prove fraud, a pattern of consistent and substantial understatement of income is, by itself, strong evidence of fraud. Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980); Cefalu v. Commissioner,276 F.2d 122, 129 (5th Cir. 1960). In the present case petitioner underreported his income for the years 1972, 1973, and 1974 by the amounts of $49,543, $163,721, and $142,188, respectively. The consistent understatement for the three consecutive years totals $355,452 and is clearly substantial when compared with the $86,528 of reported taxable income for the period. Even with every doubt on every disputed item resolved in petitioner's favor, there would be understatements of taxable income of $38,543, $78,700, and $52,837, amounting to understatements *317 of 92.5 percent, 57.7 percent, and 67.2 percent of his taxable income in 1972, 1973, and 1974, respectively. See Appendix A. We think this is strong evidence of fraud. Other indicia of fraud are petitioner's failure to keep adequate books and records, Powell v. Granquist,252 F.2d 56, 59-60 (9th Cir. 1958), and his failure to cooperate with the revenue agents conducting the investigation of his tax liability. Powell v. Granquist,supra;Vise v. Commissioner,31 T.C. 220, 226 (1958), affd. 278 F.2d 642 (6th Cir. 1960). In light of the foregoing, we conclude that respondent has shown by clear and convincing evidence that petitioner's underpayments of tax for the years 1972, 1973, and 1974 were due to fraud. Accordingly, the statute of limitations does not preclude respondent's assessment and collection of any deficiencies and additions herein. As to the deficiencies themselves, respondent's proof of underpayments with respect to the undisputed items in his net worth computation conclusively establishes those items. See Appendix A. Respondent has also proved some underpayments with respect to the three disputed *318 items by clear and convincing evidence; a fortiori, it follows that petitioner has failed to prove by the preponderance of the evidence that those amounts of the disputed items were not income to him. As to those remaining items, which we excluded for purposes of determining whether respondent had proved by clear and convincing evidence an underpayment each year, petitioner now bears the burden of proof. Rule 142(a); Zack v. Commissioner,supra. He has failed to carry that burden. First, as to the personal expenditures (food, clothing, and miscellaneous items) while these amounts are estimates, nonetheless, petitioner has failed to show such estimates to be arbitrary or erroneous. Indeed, these estimated amounts are quite reasonable. An amount of $1,500 each year for food for an adult male is minimal. An amount of $1,000 each year for clothes for an individual who owns numerous businesses, drives a Mark IV automobile, and takes frequent trips to Las Vegas, is minimal. As to the miscellaneous items, quite apart from expenses for gasoline, insurance, and health needs, the amount of $2,000 per year would hardly cover petitioner's tips and taxi fares in Las Vegas. Petitioner *319 testified that he took on each trip to Las Vegas a couple of hundred dollars in cash just to cover tips and taxi fares. From the date groupings of his borrowings from the casinos, it appears that petitioner took at least seven trips to Las Vegas in 1972, nine trips in 1973, and ten trips in 1974. Petitioner has similarly failed to carry his burden with respect to the cash expenditures made to the casinos in repayment of his gambling debts. Petitioner claims to have made these cash repayments out of gambling winnings. However, since petitioner also claims that the $41,000 Las Vegas winnings he reported on his 1972 return was net of all losses, his winnings would have had to be at least $65,000 to cover his cash repayments (as opposed to his repayments in chips) to the Riviera Hotel that year plus the $41,000, or $106,000. That is highly improbable since at the end of 1972, he still owed the Riviera Hotel $14,000 on his gambling debts. Moreover, petitioner did not report any amount as gambling winnings on his returns for 1973 and 1974, even though he admitted that his accountant had advised him that he was required to report all of his winnings. The chances that his winnings equaled *320 the amount of his cash repayments to the casinos are so unlikely as not to warrant serious consideration. Petitioner testified that in 1973 he purchased a bar in California with part of his winnings so that at least some undisclosed substantial amount of winnings could not have been used for the cash repayments, if petitioner is to be believed. Also, at the end of 1973, petitioner still owed the Riviera Hotel $6,000 on his gambling debts, and at the end of 1974, $4,000 to the hotels. Petitioner admittedly kept no books or records on his gambling activities and had no idea of either his winnings or his losses. We find his self-serving testimony, and the testimony of Frasure and Fithian, vague and unpersuasive. Thus, we accept respondent's figures of $24,000, $160,000, and $198,000 for the years 1972, 1973, and 1974, respectively, as amounts that should be included as petitioner's personal expenditures of funds for gambling losses for purposes of the net worth computation. Finally, we consider petitioner's claim of co-partnership with Ronald Sweatt in the 1641 Middlebelt Road property and J & H Stables. As provided in section 7701(a)(2), "the term 'partnership' includes a syndicate, *321 group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation." The regulations expand and explain this definition and include other groups not commonly called partnerships.[12] As noted by the regulations mere co-ownership of property does not cause the creation of a partnership. However, co-owners may be partners if the facts establish that they intended actively to carry on the business or venture as a partnership. McManus v. Commissioner,65 T.C. 197, 209 (1975), affd. 583 F.2d 443 (9th Cir. 1978); Demirjian v. Commissioner,54 T.C. 1691 (1970), affd. 457 F.2d 1 (3d Cir. 1972); Rothenberg v. Commissioner,48 T.C. 369 (1967). The burden of proof is upon petitioner. McManus v. Comissioner,supra.
*322 Sweatt did not appear or testify at the trial. Petitioner and Sweatt did not file any partnership tax return with respect to the 1641 Middlebelt Road property or J & H Stables. Petitioner did not report anything on his return in regard to 1641 Middlebelt Road; he reported J & H Stables as his sole proprietorship and claimed 100 percent of the loss in regard thereto. Further, petitioner has not provided the Court with any written partnership agreement concerning either property. Petitioner testified that there is a written partnership agreement between him and Sweatt relating to the 1641 Middlebelt Road property, but that it is in the hands of their joint attorney. Petitioner testified that he did not offer this partnership agreement into evidence in this case because their joint attorney was "a little reluctant to release [it]." We find petitioner's explanation for not producing this partnership agreement highly questionable. Neither has petitioner offered the testimony of Sweatt himself regarding his role in the alleged partnership. When the Court offered to recess the trial in order that petitioner might produce Sweatt on the witness stand, petitioner replied rather evasively *323 "I'm sure he's out of town." We think the absence of Sweatt's testimony as to his role in the alleged partnership a crucial factor in deciding whether any partnership existed. The unsigned documents and bills petitioner produced at trial do suggest that there might be some co-ownership in the 1641 Middlebelt Road property. However, petitioner purportedly bought out Sweatt's partnership interest for $10,000 and the assumption of his mortgage liability, but the purported bill of sale referred to a sale of 500 shares of stock in Joro, Inc., a Michigan corporation not otherwise explained by the record. Based on the record as a whole, we find that petitioner has not met his burden of proving that he and Sweatt were partners, equal or otherwise, in the 1641 Middlebelt Road property or in J & H Stables. In summary, respondent has carried his burden to establish fraud by clear and convincing evidence, and petitioner has failed to carry his burden to establish by a preponderance of the evidence any error in the deficiency determinations. We thus sustain respondent's determination of petitioner's unreported income and related deficiencies and his imposition of the fraud addition. To *324 reflect the foregoing, Decision will be entered for the respondent.
APPENDIX A
Petitioner stipulated to most of the figures in respondent's net worth computation, including the opening net worth, cash on hand and in banks, and business assets and real estate. While agreeing to the dollar amounts for the business assets and real estate, petitioner contended that one Ron Sweatt was the 50 percent owner of certain of the items. Assuming that to be the fact, then the dollar amounts of those items should be reduced by half and the depreciation deduction and liabilities pertaining thereto should also be reduced by half. Resolving each disputed item in petitioner's favor, there would still be unexplained increases in net worth of $41,059.83, $127,567.56, and $78,864.67, for the years 1972, 1973, and 1974, respectively, as shown below. As to any additions for personal and gambling expenditures each year, petitioner challenges only $4,500 of the personal expenditures and all of the gambling expenditures each year. Resolving all doubts in petitioner's favor, as shown in the Court's pro forma net worth computation below, we would still find unreported taxable income of $38,543.02, *325 $78,700.79, and $52,837.37, for the years 1972, 1973, and 1974, respectively. These amounts are very substantial, constituting at least 1,236 percent, 136 percent, and 204 percent more than the amounts reported by petitioner on his tax returns. Johnie Hamilton
COURT'S PRO FORMA SUMMARY OF NET WORTH COMPUTATION
12/31/71
12/31/72
12/31/73
12/31/74
Cash on Hand and in
Banks
$ 6,376.93
* $18,525.23
* $ 37,549.99
* $ 41,374.98
Business Assets and Real
Estate
87,500.00
[1] 216,950.00
[2] 395,185.48
[3] 552,561.98
Total Assets
93,876.93
235,475.23
432,735.47
593,936.96
Less: Depreciation
1,083.00
[4] 9,783.00
[4] 29,052.50
[5] 54,425.44
Assets Net of
Depreciation
92,793.93
225,692.23
403,682.97
539,511.52
Less: Liabilities
63,484.99
[6] 155,323.46
[7] 205,746.64
[8] 262,710.52
Net Worth
* $29,308.94
$70,368.77
$197,936.33
$276,801.00
Less: Prior year net
worth
29,308.94
70,368.77
197,936.33
Increase in net worth
41,059.83
127,567.56
78,864.67
Add: Personal
expenditures
[9] 11,320.00
[9] 23,221.93
[9] 14,805.00
Add: Net gambling
losses
as expenditures
[10]
[10]
[10]
Balance
$52,379.83
$150,789.49
$ 93,669.67
Less: Nontaxable
pension
[11] 5,200.00
[11] 5,200.00
[11] 5,200.00
Less: Itemized
deductions
* 3,270.81
* 7,039.70
* 6,819.00
Less: Personal
exemptions
* 2,250.00
* 2,250.00
* 3,000.00
Corrected taxable income
41,659.02
136,299.79
78,650.67
Less: Taxable income
as reported
3,116.00
57,599.00
25,813.00
Additional taxable
income
$38,543.02
$ 78,700.79
$ 52,837.67
*326 *327 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. The copy of petitioner's 1974 return filed with the Court as a joint exhibit is missing at least one page. The source of the $9,959 cannot be determined from the face of the return or from the record as a whole. The amount may represent the total amount of petitioner's disability pension, before reduction for the nontaxable portion. In any event, the exact source of this $9,959 has no effect on our decision in this case.↩
*. Respondent's net worth computation lists the address of this property, the Dos Gringos restaurant, as 1715 Middlebelt Bldg. The parties to the case have stipulated, however, that the correct address for the property is 1641 Middlebelt Road.↩
*. The stipulation of facts also included the properties located at 29037 Clarita, 36059 Angeline Circle, and 39859 Michigan Avenue as those allegedly owned jointly by petitioner and Ron Sweatt. At trial, however, petitioner testified that was in error and that those properties were in fact owned 100 percent by petitioner during those years. Hence, we have eliminated those properties and reduced the total figures accordingly. Other than the J & H Stables, all of the above property items relate to the Dos Gringos restaurant built at 1641 Middlebelt Road.↩
3. There is no contention in this case that petitioner was engaged in a trade or business as a gambler. Commissioner v. Groetzinger,↩ 480 U.S.     (1987).
4. Section 6501 provides in pertinent part: (a) General Rule.-Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions.- (1) False Returns.-In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
5. Section 6653(b) provides in pertinent part that: (b) Fraud.-If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). * * * ↩
6. See also Phillips v. Commissioner,T.C. Memo. 1984-133; Compton v. Commissioner,T.C. Memo. 1983-642; and Rinehart v. Commissioner,T.C. Memo. 1983-184↩.
7. See also Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971); Zack v. Commissioner,T.C. Memo. 1981-700, affd. 692 F.2d 28 (6th Cir. 1982), cert. denied 460 U.S. 1084 (1983); Compton v. Commissioner,supra;Diehl v. Commissioner,T.C. Memo. 1982-23; Ginsburg v. Commissioner,T.C. Memo. 1976-199; Foster v. Commissioner,T.C. Memo. 1965-246, affd. on fraud issue 391 F.2d 727↩ (4th Cir. 1968).
8. See Gallo v. Commissioner,T.C. Memo. 1983-367↩.
9. This case suffered from petitioner's proclivity to change attorneys. Although his present counsel had been involved at a very early stage of the audit, his services had been terminated, other lawyers then represented petitioner and their services were terminated some time after the petition was filed, and his present counsel was not brought back into the case until a few days before the trial. The Court allowed the parties 120 days for their simultaneous opening briefs, later extended for an additional 60 days upon respondent's motion. Respondent's counsel then submitted exhaustive requested findings of fact and brief, thoroughly analyzing the evidence. Petitioner failed to file an opening brief during the extended period, but the Court permitted him to file two months out of time. Petitioner then filed a virtually useless two-page opening "brief" stating ultimate conclusions without analysis of the evidentiary record; respondent understandably chose to file no reply brief thereto and thus never synthesized the evidence as a whole. Petitioner's reply brief was another two-page statement of conclusions that simply ignored the record as a whole. Careful analysis and synthesis of the evidence of record would have facilitated disposition of this case, perhaps by a concession by petitioner at least as to the deficiencies.↩
10. See also Krampf v. Commissioner,T.C. Memo. 1983-382↩.
11. This computation is not precise because each year the preceding year's net worth must be deducted to determine that current year's increase in net worth, but this computation is illustrative. For a precise computation giving petitioner the benefit of the doubt on every item in dispute in this case, see the Court's pro forma net worth computation in Appendix A.↩
12. Section 301.7701-3(a), Proced. & Admin. Regs., provides in pertinent part: A joint undertaking merely to share expenses is not a partnership. For example, if two or more persons jointly construct a ditch merely to drain surface water from their properties, they are not partners. Mere co-ownership of property which is maintained, kept in repair, and rented or leased does not constitute a partnership. For example, if an individual owner, or tenants in common, of farm property lease it to a farmer for a cash rental or a share of the crops, they do not necessarily create a partnership thereby. Tenants in common, however, may be partners if they actively carry on a trade, business, financial operation, or venture and divide the profits thereof. For example, a partnership exists if co-owners of an apartment building lease space and in addition provide services to the occupants either directly or through an agent.↩
*. Figure stipulated and no further adjustments or explanations required. ↩
1. Petitioner stipulated in paragraph 10 that $235,950 was the correct figure, but as to $38,000 of that amount, he contended he owned only 50 percent of the assets. Accordingly, for purposes of this calculation, we reduce the $235,950 by $19,000, to $216,950. ↩
2. Petitioner stipulated in paragraph 10 that $467,929.46 was the correct figure, but as to $188,387.96 of that amount, he contended he owned only 50 percent of the assets. At trial he agreed, however, that he in fact was the 100 percent owner as to two of the stipulated items (29037 Clarita and 36059 Angeline Circle) totaling $42,900, so that he only contended for 50 percent ownership as to $145,487.96 of the assets. Accordingly, for purposes of the calculation, we reduce the $467,929.46 by $72,743.93, to $395,185.48. ↩
3. Petitioner stipulated in paragraph 10 that $754,671.46 was the correct figure, but as to $475,618.96 of that amount, he contended he owned only 50 percent of the assets. At trial, he agreed, however, that he in fact was the 100 percent owner as to three of the stipulated items (29037 Clarita, 36059 Angeline Circle, and 39859 Michigan Avenue), thus reducing to $404,218.96 the assets as to which he contends to be only a 50 percent owner. Accordingly, for purposes of this calculation, we reduce the $754,671.46 by $202,109.48, to $552,561.98. ↩
4. No adjustment in depreciation results from the change in business assets, since no depreciation was claimed in 1972 or 1973 in connection with the assets involving Ron Sweatt. See Schedule D of respondent's net worth computation. ↩
5. Petitioner stipulated in paragraph 11 that $55,665.38 was the correct depreciation deduction for 1974, subject to an adjustment for any assets as to which Ron Sweatt owned 50 percent. See Schedule D of respondent's computation. Depreciation as to those assets was claimed in an amount of $2,479.88; hence, for purposes of this calculation, the $55,665.38 deduction will be reduced by $1,239.94, to $54,425.44. It is possible that the $4,000 additional first year depreciation for 1974 pertained to these Ron Sweatt assets, but for purposes of this calculation, we resolve any doubt in petitioner's favor and will not further reduce the depreciation deduction. ↩
6. Petitioner stipulated in paragraph 12 that $169,343.50 was the correct figure for liabilities subject to the Ron Sweatt ownership issue. He further stipulated in paragraph 13 that the adjustment for Ron Sweatt's 50 percent ownership of certain assets would affect $28,040.08 of these liabilities. Accordingly, for purposes of this calculation, since one-half of that amount would be Sweatt's liability, we decrease the liability figure by $14,020.04, to $155,323.46. ↩
7. Petitioner stipulated in paragraph 12 that $218,877.62 was the correct figure for liabilities subject to the Ron Sweatt ownership issue. He further stipulated in paragraph 13 that the adjustment for Ron Sweatt's 50 percent ownership of certain assets would affect $26,261.96 of these liabilities. Accordingly, for purposes of this calculation, since one-half of that amount would be Sweatt's liability, we decrease the liability figure by $13,130.98, to $205,746.64. ↩
8. Petitioner stipulated in paragraph 12 that $347,114.79 was the correct figure for liabilities subject to the Ron Sweatt ownership issue. He further stipulated in paragraph 13 that the adjustment for Ron Sweatt's 50 percent ownership would affect $168,808.55 of these liabilities. Accordingly, for purposes of the calculation, since one-half of that amount would be Sweatt's liability, we decrease the liability figure by $84,404.27, to $262,710.52. ↩
9. Petitioner stipulated in paragraph 14 to these amounts of personal expenditures each year. Schedule F of respondent's net worth computation included another figure of $2,150 for 1974 for medical, which is neither agreed to by petitioner in paragraph 14 nor reserved as a disputed item in paragraph 15 of the stipulation. We give petitioner the benefit of the doubt by excluding the $2,150 as a personal expenditure for 1974. ↩
10. Solely for purposes of this computation, we accept petitioner's inherently incredible testimony that he had winnings that just equaled his gambling losses. If he had winnings in any amount less than the known amounts that he repaid to Las Vegas hotels, then these repayments come from other unreported income sources. If he had any winnings in any amount in excess of these repayments, then he failed to report that excess (except in 1972 for which respondent has given him credit) and that would represent further unreported taxable income. Petitioner's explanation "works" only if his winnings exactly equaled his losses, a possibility that is too remote to seriously consider except for this pro forma net worth statement. ↩
11. Petitioner insisted at trial that his pension was greater than this $5,200 amount. We note that on his 1972 return, petitioner listed pension as $8,496 and excluded the entire amount from income; he reported no part of the pension as income in 1973 and 1974. Since petitioner has not established that he is entitled to any nontaxable exclusion greater than $5,200 (sections 104, 105), and since he has not reported any part of his pension as income, any additional pension amount would merely increase petitioner's unreported taxable income.↩